LAKE VIEW SCHOOL DISTRICT NO. 25 of Phillips County, Arkansas, *et al.*, *Appellants v.* Governor Mike HUCKABEE; Senator Mike Beebe, President Pro Tempore of the Senate; Representative Shane Broadway, Speaker of the House; State Auditor Gus Wingfield; State Treasurer Jimmie Lou Fisher; Director of the Arkansas Department of Education Raymond Simon; Arkansas State Board of Education Members Luke Gordy, William Fisher, Jonell Caldwell, Anita Yates, Lewis Thompson, Claiborne Deming, Richard Smith, Betty Pickett, Robert Hackler, and Shelby Hillman; and Director of the Arkansas Department of Finance and Administration Richard Barclay, *Appellees*; and Rogers School District No. 30 and Bentonville School District No. 6 of Benton County, and Little Rock School District of Pulaski County, *Intervenors/Appellees*

01-836 91 S.W.3d 472

Supreme Court of Arkansas
Opinion delivered November 21, 2002

[Petition for rehearing denied December 19, 2002.]

E. Dion Wilson; Don Trimble; and Lewellen & Associates, for appellant class; and Jack, Lyon & Jones, P.A., by: Eugene G. Sayre, special attorney for appellant class.

Mark Pryor, Att'y Gen., by: Dennis R. Hansen, Deputy Att'y Gen.; Brian G. Brooks, Sr. Ass't Att'y Gen.; and Timothy G. Gauger, Ass't Att'y Gen., for State appellees.

Matthews, Campbell, Rhoads, McClure, Thompson & Fryauf, P.A., by: David R. Matthews, for intervenors-appellees Rogers and Bentonville Public School Districts.

Friday, Eldredge & Clark, by: Christopher Heller and John C. Fendley, Jr., for intervenor-appellee Little Rock School District.

Mitchell, Blackstock, Barnes, Wagoner, Ivers & Sneddon, by: Clayton R. Blackstock and Mark Burnette, for amicus curiae Arkansas Education Association.

Kaplan, Brewer, Maxey & Haralson, P.A., by: Regina Haralson, for amicus curiae Arkansas Public Policy Panel and Rural School and Community Trust.

Dudley & Compton, by: Cathleen V. Compton, for amicus curiae Arkansas Policy Foundation.

Lavey & Burnett, by: John L. Burnett, for amicus curiae Arkansas Advocates for Children and Families.

Barrett & Deacon, A Professional Association, by: D.P. Marshall Jr., Leigh M. Chiles, and Brian A. Vandiver, for amicus curiae Arkansas State Chamber of Commerce, Inc., and Associated Industries of Arkansas, Inc.

ROBERT L. BROWN, Justice. This is an appeal from the final order of the Pulaski County Chancery Court entered May 25, 2001, which concluded that the current school-

funding system is unconstitutional under the Education Article (Article 14, § 1) and the Equality provisions (Article 2, §§ 2, 3, and 18) of the Arkansas Constitution.[1] The trial court also awarded counsel for Lake View School District No. 25 and the resulting class total attorneys' fees in the amount of $9,338,035. We affirm the trial court's order regarding the unconstitutionality of the public school-funding system but reverse its finding relative to excess debt service as a credit against each school district's uniform rate of 25 mills. We affirm the grant of attorneys' fees but modify the amount to an award of $3,088,050, plus costs in the amount of $309,000.

This case has been in litigation for more than ten years. On August 19, 1992, Lake View School District No. 25, school district officials, and certain individuals residing in Phillips County (hereinafter Lake View) sued the Governor of the State, the State Treasurer, the Speaker of the House of Representatives, the President of the Senate, Officers of the State Department of Education, and the State Board of Education (hereinafter referred to collectively as the State).[2] The complaint prayed for (1) a declaration that the school-funding system was unconstitutional under both the United States Constitution and the Arkansas Constitution, and (2) an injunction against implementing the unconstitutional system.

On November 9, 1994, then-chancery judge Annabelle Clinton Imber found that the school-funding system did not violate the United States Constitution, but that it did violate the Education Article (Article 14, § 1) and the Equality provisions (Article 2, §§ 2, 3, and 18) of the Arkansas Constitution. In December 1994, Judge Imber modified her November order slightly with two additional orders. For purposes of this opinion, the three orders will be referred to as the 1994 order. The chancery judge stayed the effect of her order for two years to enable the Arkansas General Assembly to enact a constitutional school-funding system

---

[1] Amendment 80 to the Arkansas Constitution which became effective July 1, 2001, designated all courts as "circuit courts."

[2] The style of this case reflects the appellees as identified in the State's notice of appeal.

in accordance with her opinion. In 1995, the chancery judge denied Lake View counsel attorneys' fees. On March 11, 1996, this court dismissed an appeal by the State contesting the 1994 order based on the fact that the order was not final, since the two-year stay was still in effect. *See Tucker v. Lake View School Dist. No. 25*, 323 Ark. 693, 917 S.W.2d 530 (1996) (*Lake View I*). In *Lake View I*, we expressly referred to the fact that Lake View's rights in the matter had not been concluded and that further hearings before the trial court were necessary before the trial court's order could be placed into execution. At the expiration of the two-year stay near the end of calendar year 1996, neither Lake View nor the State appealed from the trial court's 1994 order.

During its General Session in 1995, the Arkansas General Assembly enacted several acts for the purpose of establishing a new school-funding system. Specifically, Acts 916 and 917 were enacted, as well as Act 1194, which appropriated over $1.3 billion in school funding for the first year of the next biennium and more than $1.4 billion for the second year of the biennium.[3]

On August 22, 1996, following Lake View's third and fourth amended complaints, the trial court certified the Lake View class, as requested by Lake View, which included all school districts in the state, students and parents of students in all school districts, school board members of all school districts, and school district taxpayers who support the system. On November 5, 1996, the people of Arkansas approved by majority vote Amendment 74 to the Arkansas Constitution which fixed a uniform rate of 25 mills for each school district as the *ad valorem* property tax rate for the maintenance and operation of the public schools and permitted increases in the uniform millage rate as "variances" to enhance public education.

At its next General Session, the General Assembly enacted new legislation providing for public school financing, including Act 1307 of 1997, codified in part at Ark. Code Ann. §§ 6-20-302 *et seq.* (Repl. 1999). Act 1307 repealed portions of Act 917 of

---

[3] This court subsequently held that Act 916 of 1995 was unconstitutionally adopted due to an alteration of the bill, which ran counter to its original purpose as stated in the bill's title. *See Barclay v. Melton*, 339 Ark. 362, 5 S.W.3d 457 (1999).

1995 but, in addition, made legislative findings relating to educational adequacy, defined a "uniform rate of tax" under Amendment 74, defined terms used in the school-funding formula, and provided incentives for school districts to encourage millage assessments to enhance public education. The General Assembly also enacted Act 1108 of 1997, now codified at Ark. Code Ann. §§ 6-15-1001 through 1011 (Repl. 1999), which set educational goals, and Act 1361 of 1997, which appropriated funds totaling over $1.5 billion for each year of the next biennium for grants and aid to the state's school districts.

In 1998, there was an effort by Lake View and the State to settle the lawsuit. The trial court, however, declined to approve the settlement.[4] On August 17, 1998, the trial court dismissed Lake View's fourth amended complaint on the grounds that with Amendment 74 and the 1995 and 1996 legislative acts, a new standard for public school funding had been implemented. Legislative acts are presumed to be constitutional, the trial court observed, and, thus, the fourth amended complaint and show-cause petition for why the State should not be held in contempt of the 1994 order were moot. No attorneys' fees were granted to Lake View counsel.

The 1998 Dismissal Order was appealed to this court, and we reversed. *See Lake View Sch. Dist. No. 25 v. Huckabee*, 340 Ark. 481, 10 S.W.3d 892 (2000) (*Lake View II*). In *Lake View II*, we remanded the matter for a compliance trial to be held regarding the constitutionality of the post-1994 legislative acts and for a determination of attorneys' fees. *See id.*[5]

In its 1999 General Session, the General Assembly appropriated funds for public education totaling more than $1.6 billion for the first year of the biennium and more than $1.7 billion for the second year. *See* Act 1392 of 1999. The General Assembly also enacted Act 999 of 1999, amending Ark. Code Ann. §§ 6-15-401 through 407, 6-15-419 through 422, and 6-15-1003 (Repl.

---

[4] In January 1997, Judge Imber assumed her role as Associate Justice of the Arkansas Supreme Court. Chancellor Collins Kilgore was subsequently assigned the case.

[5] For a complete history of this case through March 2, 2001, refer to *Lake View Sch. Dist. No. 25 v. Huckabee*, 340 Ark. 481, 10 S.W.3d 892 (2000) (*Lake View II*).

1999), and establishing the Arkansas Comprehensive Testing Assessment and Accountability Program (ACTAAP) to assess and evaluate academic progress and performance in the public schools with an emphasis on reading and writing, literacy, and mathematics from the earliest grades.

Prior to the compliance trial in 2000, a total of 144 school districts sought to intervene and align themselves with the State's position that the post-1994 legislation had cured the constitutional deficiencies. The trial court denied the motions. In September and October of 2000, the trial court conducted the compliance trial over nineteen days. Thirty-six witnesses testified, including some for a second time. One hundred and eighty-seven exhibits were introduced and considered. The resulting appellate record was ninety-nine volumes and totaled 20,878 pages. On September 19, 2000, Lake View filed a revised petition for an award of attorneys fees in the amount of $32.5 million and for litigation costs of at least $200,000. On September 22, 2000, the Rogers and Bentonville School Districts filed a cross-complaint against the State in which they contended that the school-funding system was constitutionally inadequate.

Judge Kilgore entered his final order on May 25, 2001, as already referenced, in which he declared the current school-funding system to be unconstitutional on the twin grounds of inadequacy under the Education Article and inequality under the Equality provisions of the Arkansas Constitution. *See* Ark. Const. art. 14, § 1, art. 2, §§ 2, 3, 18. He further awarded Lake View's counsel attorneys' fees of $9,338,035 but denied their request for costs.

## I. Posture of the Parties

Though Lake View prevailed on the core issue of the unconstitutionality of the post-1994 legislative acts, it filed the first notice of appeal on June 22, 2001, and raised issues including Judge Kilgore's failure to deem Judge Imber's 1994 order law of the case, the failure to classify desegregation money as state aid, the failure of the trial court to award adequate attorneys' fees, the failure of the trial court to hold the State in contempt of court for

failure to comply with the 1994 order, and the failure of the trial court to order specific remedies.

Little more than one hour later on June 22, 2001, the State appealed the 2001 order on both the constitutionality points and the award of attorneys' fees. Over the ensuing year, the parties jockeyed for position on various issues such as who was the true appellant and who was the cross-appellant, who would prepare the abstract of testimony, and whether a separate brief on attorneys' fees was warranted. This court concluded that Lake View was the appellant and the State was the cross-appellant, that the State could reabstract the testimony and record, and that Lake View was entitled to a brief on the merits of the case as well as a brief on attorneys' fees. The Rogers and Bentonville school districts were designated as Intervenors/Appellees, as was the Little Rock School District. The three school districts intervened in support of the trial court's conclusion that the school-funding system was unconstitutional on adequacy and inequality grounds. No other school districts intervened on appeal. The rulings and orders made by this court over the past year were memorialized in an opinion of this court. *See Lake View Sch. Dist. No. 25 v. Huckabee*, 349 Ark. 116, 76 S.W.3d 250 (2002) (*per curiam*) (*Lake View III*). This opinion included reference to the filing of *amicus curiae* briefs. With the permission of this court, the following groups filed *amicus curiae* briefs in this matter: the Arkansas Education Association (in support of the trial court's order); the Arkansas State Chamber of Commerce, Inc. and the Associated Industries of Arkansas, Inc. (in support of the trial court's order); Arkansas Advocates for Children and Families (in support of the trial court's order); the Arkansas Public Policy Panel and the Rural School and Community Trust (in support of the trial court's order); and the Arkansas Policy Foundation (in support of the State's position).

## II. School-Funding System

At the time of the 2001 final order, there were 310 school districts in Arkansas. In *Lake View II*, this court described the school-funding system as it existed in 1994 as follows:

In 1994, school districts received approximately thirty percent of their revenue from local funds, sixty percent from state aid, and ten percent from federal funds.

*Lake View II*, 340 Ark. at 484, 10 S.W.3d at 894.

In his 2001 final order, Judge Kilgore presented what he described as a "simplified explanation" of the school-funding formula, which no party has contested. According to the trial court, under the formula, the State Department of Education first calculates a "base level revenue" which is determined by adding all state and local money available to all public schools throughout the state and dividing that figure by the average daily membership of all students statewide. The base level revenue per student according to the 2001 order was $4535 for the 1996-97 school year. The State then calculates the local resource rate for students in each individual school district. This calculation is made by first determining the assessed value of personal, real, and utility property within the school district, and then multiplying that figure by 98 percent. That figure is multiplied by the uniform rate of 25 mills pursuant to Amendment 74. The resulting number is then divided by the average daily membership of students in that school district which results in the local resource rate. If the local resource rate is less than the base level revenue per student ($4535 in 1996-97), the Department of Education will make up the difference through its Equalization Aid so that all school districts in the state will receive equal revenues per student under the formula.[6]

The 2001 school-funding formula is essentially the same as what was in place in 1994, which Judge Imber described in her order. The principal differences are that in 1994 the Department of Education used a "charge" of 26.7 mills rather than the uniform rate of 25 mills pursuant to Amendment 74, which was approved two years later, and the average daily membership was "weighted" for fictional students to provide school districts with funds for students with special needs. The 1994 "weighted" sys-

---

[6] State statutes refer to "base local revenue per student" rather than "base level revenue" and "local revenue per student" rather than "local resource rate." *See* Ark. Code Ann. § 6-20-303(5) & (15) (Repl. 1999).

tem changed in 1995 with Act 1194, in which the General Assembly began providing grants and aid for special needs through specific categories. In 1994 and in 2001, based upon the two court orders, the State sought to achieve equal opportunity for Arkansas students by equalizing per-student revenues statewide according to the base level rate.

In 1994, as in 2001, individual school districts could pass additional millages assessed against district property to enhance local education, whether for building programs or for maintenance and operation. Indeed, Amendment 74 specifically contemplates variations in millages among school districts for maintenance and operation:

> (a) The General Assembly shall provide for the support of common schools by general law. In order to provide quality education, it is the goal of this state to provide a fair system for the distribution of funds. It is recognized that, in providing such a system, some funding variations may be necessary. The primary reason for allowing such variations is to allow school districts, to the extent permissible, to raise additional funds to enhance the educational system within the school district. It is further recognized that funding variations or restrictions thereon may be necessary in order to comply with, or due to, other provisions of this Constitution, the United States Constitution, state or federal laws, or court orders.

The State provides other funding and guarantees to school districts as well. For example, it provides what the trial court described as "additional base funding," which guarantees that all school districts will have a minimum state and local revenue per average daily membership that is at least eighty percent of the state and local revenue available for a school district at the ninety-fifth percentile.[7] The State also has programs to assist school districts

---

[7] The school district at the ninety-fifth percentile is determined pursuant to Ark. Code Ann. § 6-20-303(17) (Repl. 1999), which provides:

"Local school district at the ninety-fifth percentile" means, when ranking school districts in descending order by the total state and local revenue per average daily membership, a district which falls at the ninety-fifth percentile of the total number of pupils in attendance in the schools of this state, as described by 34 C.F.R. § 222.63 (1994)[.]

with capital improvements, although the Growth Facilities Funding program for new buildings and equipment was phased out in 2001. What remains is General Facilities Funding for purchases of buses, computers, facility repairs, and maintenance, and Debt Service Funding to assist school districts in paying their debt service incurred for capital improvements. The trial court concluded that these programs for capital improvements were inadequate:

> Even with these three programs, some districts cannot afford to build new buildings, complete necessary repairs or buy buses. Either the money is not available through General Facilities or Growth Facilities Funding or the district is too poor to incur sufficient debt to finance new construction and take advantage of the Debt Service Funding Supplement.

The trial court further alluded to three formulas commonly used to determine whether disparities in funding among the school districts exist. In doing so, the court drew a distinction between *revenues* provided to the school districts by means of local and state funding and *expenditures* made by the school districts for the benefit of their students:

> 20. The purpose of the three formulas (Federal Range Ratio, Coefficient of Variation and GINI Index of Inequality) is to aid in analyzing disparities in funding for schools, school districts and students. But the question, as framed by the Supreme Court, is do unconstitutional disparities exist? Does the state fulfill its constitutional duty to provide each of its children an education adequate to give the child the opportunity to realize his potential, enrich his life and be an asset to his community? The formulas do not provide an exclusive way to answer the questions. (Greene, Def. Ex. 68, fn 1)
>
> 21. Using expenditures in the calculation of the Federal Range Ratio, this court finds that there is more than a 25% difference between the 5th and the 95th percentile in amount spent per pupil which is not in compliance with the 1994 Order. However, using revenues, the State is within the 25% range differential. Using expenditures in the Coefficient of Variation, the State is not in compliance. Using expenditures in the calculation of the GINI Index of Inequality, the State is in compliance.

Finally, federal funds are distributed to the school districts for special-need students. These funds are dispersed outside of the

school-funding formula and are not subject to the discretion of the school districts.

### III. Standard of Review

Our standard of review in chancery cases has been often stated:

> We review chancery cases *de novo* on the record, but we do not reverse a finding of fact by the chancery court unless it is clearly erroneous. *Moon v. Marquez*, 338 Ark. 636, 999 S.W.2d 678 (1999); *Office of Child Support Enforcement v. Eagle*, 336 Ark. 51, 983 S.W.2d 429 (1999). A finding of fact by the chancery court is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed. *Huffman v. Fisher*, 337 Ark. 58, 987 S.W.2d 269 (1999); *RAD-Razorback Ltd. Partnership v. B.G. Coney Co.*, 289 Ark. 550, 713 S.W.2d 462 (1986). It is this court's duty to reverse if its own review of the record is in marked disagreement with the chancery court's findings. *Dopp v. Sugarloaf Mining Co.*, 288 Ark. 18, 702 S.W.2d 393 (1986) (citing *Rose v. Dunn*, 284 Ark. 42, 679 S.W.2d 180 (1984); *Walt Bennett Ford v. Pulaski County Special Sch. Dist.*, 274 Ark. 208, 624 S.W.2d 426 (1981)).

*State Office of Child Support Enforcem't v. Willis*, 347 Ark. 6, 11–12, 59 S.W.3d 438, 442 (2001). *See also Wisener v. Burns*, 345 Ark. 84, 44 S.W.3d 289 (2001).

We initially must address which order we are reviewing. Are we reviewing Judge Imber's 1994 order, Judge Kilgore's 2001 order, both orders, or some combination of the two? We are convinced that what is on appeal is Judge Kilgore's 2001 order in which he found the post–1994 legislative acts to be unconstitutional. In *Lake View II*, we referred to Judge Imber's November 1996 orders, where she found that the 1995 legislation constituted new facts and that law of the case would not apply to her 1994 order. We then remanded this case for a compliance trial on whether the post–1994 legislation and Amendment 74 had corrected the constitutional deficiencies. That is the task which Judge Kilgore undertook—an examination of the new legislative acts in light of constitutional mandates. We further note on this point

that Judge Imber's 1994 order was never appealed after it reached finality, but that the State and Lake View specifically appealed from Judge Kilgore's order. Accordingly, it is the 2001 order that is before us for review.

With this in mind, we turn to the merits of this appeal. Because the State's points on appeal go to the heart of the matter, we will consider them first.

### IV. Justiciability

The State devotes a substantial portion of its opening brief to its argument that the constitutionality of the school-funding system is a nonjusticiable issue for the courts. In the State's view, the courts unduly interfere and even usurp legislative and executive branch functions when they declare school-funding systems unconstitutional. This, the State maintains, equates to a mandate to the General Assembly to appropriate more funds for the public schools which violates the separation-of-powers clauses in the Arkansas Constitution. *See* Ark. Const. art. 4, §§ 1, 2. Moreover, the State contends, citing *Baker v. Carr*, 369 U.S. 186 (1962), that the funding of our public schools is a political question involving public policy and the interplay between the State and local school districts, which is best left to the General Assembly to resolve. In support of its nonjusticiability argument, the State directs our attention to five cases from other jurisdictions. *See Ex parte James v. Alabama Coalition for Equity, Inc.*, 836 So. 2d 813 (Ala. 2002); *Marrero v. Commonwealth of Pennsylvania*, 559 Pa. 14, 739 A.2d 110 (1999); *Coalition for Adequacy & Fairness in School Funding v. Chiles*, 680 So. 2d 400 (Fla. 1996); *Committee for Educational Rights v. Edgar*, 174 Ill. 2d 1, 672 N.E.2d 1178 (1996); *City of Pawtucket v. Sundlun*, 662 A.2d 40 (R.I. 1995). As a corollary to this argument, the State urges that the courts should avoid getting "mired down" in endless litigation in an effort to supervise the public schools.

■■ The State's nonjusticiability point appears to have been raised for the first time in this appeal. The State implicitly claims that a violation of separation of powers is a question of subject-matter jurisdiction, which, of course, can be raised at any

time or even by this court on its own motion. *See Vanderpool v. Fidelity & Cas. Ins. Co.*, 327 Ark. 407, 939 S.W.2d 280 (1997). Regardless of this argument, we believe that the issue of nonjusticiability was laid to rest in a previous school-funding case in which we discussed the distinctive roles of the legislative and judicial branches. *See DuPree v. Alma Sch. Dist. No. 30*, 279 Ark. 340, 651 S.W.2d 90 (1983). The State never discusses *DuPree* in connection with this point, but in that case, we quoted favorably from a seminal school-funding opinion by the California Supreme Court:

> The dispositive answer to the above arguments is simply that this court is not now engaged in—nor is it about to undertake—the "search for tax equity" which defendants prefigure. As defendants themselves recognize, it is the Legislature which by virtue of institutional competency as well as constitutional function is assigned that difficult and perilous quest. Our task is much more narrowly defined: it is to determine whether the trial court committed prejudicial legal error in determining whether the state school financing system at issue before it was violative of our state constitutional provisions guaranteeing equal protection of the laws insofar as it denies equal educational opportunity to the public school students of this state. If we determine that no such error occurred, we must affirm the trial court's judgment, leaving the matter of achieving a constitutional system to the body equipped and designed to perform that function.

*DuPree*, 279 Ark. at 349-50, 651 S.W.2d at 95 (quoting *Serrano v. Priest*, 18 Cal. 3d 728, 759, n. 38, 557 P.2d 929, 946, 135 Cal. Rptr. 345, 362 (1976) (internal citations omitted)). We continue to adhere to our opinion in *DuPree* and its discussion of the respective roles of the legislative and judicial branches relative to school funding. Clearly, the roles are different, and we conclude that the two branches do not operate at cross purposes in the school-funding context.

■ We further observe that the Education Article in the Arkansas Constitution designates the *State* as the entity to maintain a general, suitable, and efficient system of free public schools:

> Intelligence and virtue being the safeguards of liberty and the bulwark of a free and good government, the *State* shall ever

> maintain a general, suitable and efficient system of free public schools and shall adopt all suitable means to secure to the people the advantages and opportunities of education.

Ark. Const., art. 14, § 1 (emphasis added). That is not the case in the state constitutions in four of the five cases cited by the State as authority for its nonjusticiability position; rather, in those state constitutions it is incumbent upon the *General Assembly* to provide, maintain, or promote the public schools. *See James v. Alabama Coalition for Equity, Inc., supra* ("The legislature may by law provide for or authorize the establishment and operation of schools. . . ."); *Marrero v. Commonwealth of Pennsylvania, supra* ("The General Assembly shall provide for the maintenance and support of a thorough and efficient system of public education. . . ."); *Coalition for Adequacy & Fairness in School Funding, Inc. v. Chiles, supra* ("Adequate provision shall be made by law for a uniform system of free public schools. . . ."); *City of Pawtucket v. Sundlun, supra* ("[I]t shall be the duty of the general assembly to promote public schools. . . .").

As a historical footnote, our own Education Article in our current state constitution was adopted in 1874 and amended by Amendment 53 in 1968. The four preceding constitutions in Arkansas all stated that the General Assembly would provide for public education. *See* Ark. Const. of 1836, art. VII; Ark. Const. of 1861, art. VII, § 1; Ark. Const. of 1864, art. VIII; Ark. Const. of 1868, art. IX, § 1. In 1874, however, that duty was expressly shifted to the State, which signaled, in our judgment, a deliberate change. The people of this state unquestionably wanted all departments of state government to be responsible for providing a general, suitable, and efficient system of public education to the children of this state.

The State's argument appears to be that not only are legislative acts presumed to be constitutional, *see, e.g., Ford v. Keith*, 338 Ark. 487, 996 S.W.2d 20 (1999), but that they are *per se* constitutional and not subject to judicial review. Thus, the State's position is that the judiciary has no role in examining school funding in light of the Arkansas Constitution, though the annual appropriation constitutes almost one half of the State's total budget and affects the vast majority of school-aged children in this State.

We reject the State's argument. This court's refusal to review school funding under our state constitution would be a complete abrogation of our judicial responsibility and would work a severe disservice to the people of this state. We refuse to close our eyes or turn a deaf ear to claims of a dereliction of duty in the field of education. As Justice Hugo Black once sagely advised: "[T]he judiciary was made independent because it has . . . the primary responsibility and duty of giving force and effect to constitutional liberties and limitations upon the executive and legislative branches." Hugo L. Black, *The Bill of Rights*, 35 N.Y.U. L. Rev. 865, 870 (1960).

Early on, this court announced:

> The people of the State, in the rightful exercise of their sovereign powers, ordained and established the constitution; and the only duty devolved upon this court is to expound and interpret it.

*State v. Floyd*, 9 Ark. 302, 315 (1849). And then in 1878, we said:

> [W]e claim it to be a right and a duty to interpret our own Constitution and laws; and in local concerns, so long as they do not conflict with the Constitution and laws of the United States, they are supreme . . . .

*Graham v. Parham*, 32 Ark. 676, 684 (1878).

The Supreme Court of Kentucky has emphasized the need for judicial review in school-funding matters. The language of that court summarizes our position on the matter, both eloquently and forcefully, and, we adopt it:

> Before proceeding . . . to a definition of "efficient" we must address a point made by the appellants with respect to our authority to enter this fray and to "stick our judicial noses" into what is argued to be strictly the General Assembly's business.
>
> . . . .
>
> . . . [In this case] we are asked—based solely on the evidence in the record before us—if the present system of common schools in Kentucky is "efficient" in the constitutional sense. It is our sworn duty, to decide such questions when they are before us by applying the constitution. The duty of the judiciary in Kentucky was so determined when the citizens of Kentucky enacted

the social compact called the Constitution and in it provided for the existence of a third equal branch of government, the judiciary.

. . . .

. . . To avoid deciding the case because of "legislative discretion," "legislative function," etc., would be a denigration of our own constitutional duty. To allow the General Assembly (or, in point of fact, the Executive) to decide whether its actions are constitutional is literally unthinkable.

. . . .

The judiciary has the ultimate power, and the duty, to apply, interpret, define, and construe all words, phrases, sentences and sections of the Kentucky Constitution as necessitated by the controversies before it. It is *solely* the function of the judiciary to so do. This duty must be exercised even when such action services as a check on the activities of another branch of government or when the court's view of the constitution is contrary to that of other branches, or even that of the public.

*Rose v. Council for Better Education, Inc.*, 790 S.W.2d 186, 208-10 (Ky. 1989) (emphasis in original). For these reasons, we conclude the matter before us is justiciable.

## V. Adequacy

We turn then to a review of the trial court's declaration that the State's school-funding system violates Article 14, § 1. To reiterate, § 1 of the Education Article reads:

Intelligence and virtue being the safeguards of liberty and the bulwark of a free and good government, the State shall ever maintain a general, suitable and efficient system of free public schools and shall adopt all suitable means to secure to the people the advantages and opportunities of education. The specific intention of this amendment is to authorize that in addition to existing constitutional or statutory provisions the General Assembly and/or public school districts may spend public funds for the education of persons over twenty-one (21) years of age and under six (6) years of age, as may be provided by law, and no other interpretation shall be given to it. [As amended by Const. Amend. 53.]

The State first contends that this court did not remand this case in *Lake View II* for a compliance trial on adequacy under Article 14, but only for a trial on equality under Article 2, §§ 2, 3, and 18. The State is incorrect. In *Lake View II*, this court remanded the case to the trial court for a determination of whether the post-1994 legislation had satisfied the two constitutional deficiencies underscored by Judge Imber in her 1994 order. Judge Imber had concluded that the school-funding system failed as inadequate under Article 14 and inequitable under Article 2 of the Arkansas Constitution. Indeed, Lake View had filed a separate lawsuit contesting school funding as constitutionally inadequate, and the trial court properly approved a nonsuit of that action by Lake View because adequacy issues were already before the court in the compliance trial. The State's argument is meritless.

*a. Adequacy Study.*

The keystone of the State's adequacy argument is that an adequate education in Arkansas is impossible to define. We observe that on this point, the Department of Education and the General Assembly may be at odds. In her 1994 order, Judge Imber stated that there had been no studies on the per-student cost to provide "a general, suitable and efficient" educational opportunity to Arkansas schoolchildren. In 1995, the Arkansas General Assembly seized upon that theme and called for an adequacy study:

> (c) The State Board of Education shall devise a process for involving teachers, school administrators, school boards, and parents in the definition of an "adequate" education for Arkansas students.
>
> (d) The State Board shall seek public guidance in defining an adequate education and shall submit proposed legislation defining adequacy to the Joint Interim Committee on Education prior to December 31, 1996.

Act 917 of 1995, § 6(c–d).

Despite this directive from the General Assembly, nothing has been done by the Department of Education, and seven years have passed. Judge Kilgore echoed this in his 2001 order:

Pursuant to Act 917 of 1995, and in order that an amount of funding for an education system based on need and not on the amount available but on the amount necessary to provide an adequate educational system, the court concludes an adequacy study is necessary and must be conducted forthwith.

Stated simply, the fact that the Department of Education has refused to prepare an adequacy study is extremely troublesome and frustrating to this court, as it must be to the General Assembly. Indeed, the General Assembly in two 1997 Acts partially addressed what an adequate education in Arkansas would entail:

(c) The General Assembly finds that a suitable and efficient system of public education should:

. . .

(4) Assure that:

(A) All students graduating from high school are able to demonstrate a defined minimum level of competence in:

(i) English communications, oral, reading, and writing;

(ii) Mathematical skills; and

(iii) Science and social studies disciplines[.]

Act 1307 of 1997, § 1, codified at Ark. Code Ann. § 6-20-302(c)(4)(A) (Repl. 1999).

. . .

(a) Arkansas public school students will achieve competency in the basic core of knowledge and skills.

(1) Students will meet required standards in academic areas of the curriculum that will serve as a basis for students to pursue immediate and lifelong educational and employment opportunities.

(2) Students will achieve competency in language arts (writing, spelling, speaking, listening, and reading), math (computation, measurement, probability and statistics, problem solving, basic algebra, data analysis, and geometry concepts), science (physical and life science knowledge, and scientific problem solv-

ing), and social studies (history, geography, economics, and civic education).

(b) Arkansas public school students will apply practical knowledge and skills.

(1) Students will meet required academic standards in those areas that will better prepare them for lifelong career opportunities.

(2) Students will achieve competency at the local level in computer science and other technologies, practical economic and consumer skills, and be offered courses in vocational-preparation skills.

(c) Arkansas public school students will demonstrate achievement.

(1) Students will participate in the state assessments in the basic core of knowledge and skills as defined by the State Department of Education in the Arkansas Comprehensive Testing and Assessment Program.

(2) The students' numerical and percentage scores on the High School Proficiency Examination will be recorded on their transcripts, and the examination will be a part of the local school grading system in a way to be determined by the local school district.

(3) Each local school district shall report to the State Department of Education how it will incorporate the assessment system required by this subsection into the district's grading system.

Act 1108 of 1997, § 3, codified in slightly different language at Ark. Code Ann. § 6-15-1003(a), (b), (c) (Repl. 1999). In short, the General Assembly is well on the way to defining adequacy while the Department of Education, from all indications, has been recalcitrant.

■ Without the benefit of an adequacy standard developed by the Department of Education, both Judge Imber and Judge Kilgore looked to the case of *Rose v. Council for Better Education, Inc.*, *supra*, for a definition of "efficient" education:

> We concur with the trial court that an efficient system of education must have as its goal to provide each and every child with at least the seven following capacities: (i) sufficient oral and written communication skills to enable students to function in a complex and rapidly changing civilization; (ii) sufficient knowledge of

economic, social, and political systems to enable the student to make informed choices; (iii) sufficient understanding of governmental processes to enable the student to understand the issues that affect his or her community, state, and nation; (iv) sufficient self-knowledge and knowledge of his or her mental and physical wellness; (v) sufficient grounding in the arts to enable each student to appreciate his or her cultural and historical heritage; (vi) sufficient training or preparation for advanced training in either academic or vocational fields so as to enable each child to choose and pursue life work intelligently; and (vii) sufficient levels of academic or vocational skills to enable public school students to compete favorably with their counterparts in surrounding states, in academics or in the job market.

*Rose*, 790 S.W.2d at 212. Many of the "Rose standards," as we will call them, were adopted by our General Assembly with Act 1108 and Act 1307 in 1997, as has already been set forth in this opinion.

In addition to the State's argument that an adequate education is incapable of definition, it further contends that there is no correlation between enhanced school funding and better student performance. For example, it argues that more money has been spent on education since the *DuPree* decision in 1983, and student performance has not appreciably improved. The State points to the ACTAPP program for assessing and evaluating student performance in English and mathematical skills as a positive step the State has recently taken. The State also fiercely contends that the Arkansas Constitution does not require pre-school programs such as those, it contends, were mandated by Judge Kilgore.

*b. Educational Deficiencies.*

What the State does not address are Arkansas' abysmal rankings in certain key areas respecting education. What follows is a compendium of the trial court's findings, which the State does not contest:

- Arkansas ranks fiftieth among the states in per capita state and local government expenditures for elementary and secondary education.

- Arkansas students scored several tenths below the national average in a standardized test (ACT) between 1990 and 1999.

- Arkansas ranks lower than the national average for the percentage of adults twenty-five years and older who have graduated from high school.

- Arkansas ranks forty-ninth in the country for the percentage of the population age twenty-five or older with a Bachelors degree or higher.

- Arkansas is tied for fiftieth in the country in percentage of adults with graduate degrees.

- Arkansas' fourth- and eighth-grade students are below the national average for proficiency in math, reading, science and writing.

- On the first ACTAPP test, only forty-four percent of the fourth-grade students tested were proficient in reading and only thirty-four percent of those tested were proficient in math.

- Arkansas' per pupil revenue under the school-funding formula in school year 1996-97 was $4,535, while the national average was $5,923.

- Arkansas ranks between forty-eighth and fiftieth among the states in teacher pay.

Results of the State's own Benchmark testing for eighth-grade students in April 2000 showed that only sixteen percent were proficient or above in math statewide, and in the Little Rock School District only nine percent were proficient or above. Arkansas has no funding for the remediation of individual students and no funding to train teachers for remediation after ACTAPP evaluations.

With respect to Arkansas high school students entering state universities, fifty-eight percent needed remediation in either English or math. For the Rogers High School students entering a university (including some students with 3.0 grade averages), forty-four percent needed remediation in either English or math.

Judge Kilgore concluded in his 2001 order that the "State has a remarkably serious problem with student performance." We agree.

Arkansas' entry level for teacher salaries is last when compared to our eight bordering states, and Arkansas spends twenty percent less than the national average for teachers across the board. The entry level salary for Arkansas school districts bordering Memphis, Tennessee, was about $5,695 less than that offered in Memphis school districts, and for more experienced teachers the differential was almost $6,000. A similar disparity exists for beginning salaries between school districts in Texarkana, Arkansas, and Texarkana, Texas. Arkansas school districts pay about $4,000 less than those in Texas.

Serious disparities also exist in teacher salaries among school districts within the State of Arkansas. One example given by the trial court was the science teacher with two masters degrees and forty-one years' teaching experience receiving a salary of $31,500 in the Lake View School District, while a teacher with comparable degrees and experience received $43,524 in the Fort Smith School District.

Poor school districts with the most ill-prepared students are losing their teachers due to low pay. Both recruitment and retention of teachers are difficult in those districts. The Bentonville School District, which is not impoverished, will lose fifteen percent of its teachers in the next three years due to retirement. Low pay and competition from the private sector present real obstacles to teacher recruitment in that district.

Dr. Raymond Simon, Director of the Department of Education, had this to say about the salary crisis:

> MR. HELLER: And I wanted to ask you what else you — you think we should be doing in Arkansas to address students' above and beyond ACTAPP?
>
> DR. SIMON: I think we're facing — I think the most critical thing we need to address now is the issue of teacher's salaries. ACTAAP, Smart Start, Smart Step, all of that depends primarily on the classroom teacher to function. And we are beginning to see a crisis now in our State of quality teachers, some retiring.

My generation has had all of this they want in many cases, and they're — they're retiring.

. . . .

MR. MATTHEWS: That's right. Okay. We're getting there. Track with me. In order to implement ACTAPP, you've got to have good teachers?

DR. SIMON: Yes.

MR. MATTHEWS: In order to have good teachers, we've got to have more —

DR. SIMON: Money.

MR. MATTHEWS: Money.

DR. SIMON: For teachers' salaries.

MR. MATTHEWS: And until we have more money for teachers' salaries, we jeopardize the efficiency, the suitability, and the quality of the ACTAPP program, which you and others have implemented. Isn't that true?

DR. SIMON: That's correct, yes, sir.

In short, the Benchmark testing and the ACTAAP program which represent the paramount initiatives by the State to correct the course of educational deficiencies in Arkansas are dependent on quality teachers. And, according to the Director of the Department, quality teachers is an area where we have a crisis.

Testing, rankings, and teacher salaries do not tell the whole story. According to the uncontested findings of the trial court, in the Lake View School District, which is undeniably a poor school district, ninety-four percent of the students are on free or reduced school lunches. That school district has one uncertified mathematics teacher who teaches all high school mathematics courses. He is paid $10,000 a year as a substitute teacher and works a second job as a school bus driver where he earns $5,000 a year. He has an insufficient number of calculators for his trigonometry class, too few electrical outlets, no compasses and one chalkboard, a computer lacking software and a printer that does not work, an inadequate supply of paper, and a duplicating machine that is overworked. Lake View's basketball team does not have a com-

plete set of uniforms, while its band has no uniforms at all. The college remediation rate for Lake View students is 100 percent.

The Holly Grove School District has only a basic curriculum and no advanced courses or programs. The starting salary for its teachers is $21,000. Science lab equipment, computers, the bus fleet, and the heating and air conditioning systems need replacing. The buildings have leaking roofs and restrooms in need of repair. Because millage increases are difficult to win in the school district, Holly Grove must borrow against next year's revenues to repair a falling library roof and leaking gas line.

The Barton Elementary School in Phillips County has two bathrooms with four stalls for over one hundred students.

Lee County schools do not have advanced placement courses and suffer also from little or no science lab equipment, school buildings in need of repair, school buses that fail to meet state standards, and only thirty computers for six hundred students. Some buildings have asbestos problems and little or no heating or air conditioning.

These are just a few examples of deficiencies in buildings, equipment, and supplies that plague the State's school districts. School districts experiencing fast-growing student populations such as Rogers and Bentonville in Northwest Arkansas need additional buildings. Buildings in disrepair are rampant in Eastern Arkansas. And qualification for debt-service–funding supplements from the State depends on how much debt can be incurred by the school districts. Poorer districts with deteriorating physical plants are unable to incur much debt.

The Rogers School District has mushroomed by 4,300 students in the last decade. Since 1987, the enrollment in the Bentonville School District has increased 83.57 percent. About $432 of the revenue available per student in Rogers goes to debt. With the influx of the Latino population, an English-as-a-second-language program is a critical need. In 1991, eighty-four students were enrolled in the program. In 2000, there were 2,615 students enrolled. Rogers received $743,000 for the program from the State and spent $1,013,000.

In response to poor student performance, the State instituted academic distress programs in 1995 for school districts not meeting State Standards of Accreditation. *See* Ark. Code Ann. §§ 6-20-1601 through 6-20-1610 (Repl. 1999). Deficient test scores trigger Phase I, which requires the school district to submit an improvement plan to the Department of Education; then Phase II, where the Department prepares the improvement plan; and finally Phase III, where the Department may mandate consolidation or a take-over of the district. Of the twelve school districts on the academic distress list at the time of the 2001 order, all were classified as poor.

c. *Constitutional History.*

We return then to our starting point and that is what Article 14, § 1, of the Arkansas Constitution requires of the State for education:

> Intelligence and virtue being the safeguards of liberty and the bulwark of a free and good government, the State shall ever maintain a general, suitable and efficient system of free public schools and shall adopt all suitable means to secure to the people the advantages and opportunities of education.

Education has been a constitutional focus and mandate since the founding of our state. The framers of the first Arkansas constitution adopted the following Education Clause in 1836:

> Knowledge and learning generally diffused through a community being essential to the preservation of a free government, and diffusing the opportunities and advantages of education through the various parts of the State being highly conducive to this end, it shall be the duty of the General Assembly to provide by law for the improvement of such lands as are, or hereafter may be, granted by the United States to this State for the use of schools, and to apply any funds which may be raised from such lands, or from any other source, to the accomplishment of the object for which they are, or may be, intended. The General Assembly shall from time to time pass such laws as shall be calculated to encourage intellectual, scientific and agricultural improvement by allowing rewards and immunities for the promotion and improvement of arts, science, commerce, manufactures

and natural history, and countenance and encourage the principles of humanity, industry and morality.

Ark. Const. of 1836, art. VII., *reprinted in* Ark. Code Ann. Constitutions 497 (1987). The 1836 Education Article embodied two fundamental ideas: the inherent value of education in creating a virtuous citizen and the crucial role of an educated citizenry in a functioning democracy.

The Secessionist Constitution of 1861 contained a truncated Education Article:

> The General Assembly shall apply any and all funds which may be raised for the purpose of education, to the accomplishment of the object for which they may be raised; and from time to time, pass such laws as shall be calculated to encourage intellectual, scientific and agricultural improvement, by allowing rewards and immunities for the promotion and improvement of art, science, commerce, manufactures, and natural history; and countenance and encourage the principles of humanity, industry and morality.

Ark. Const. of 1861, art. VII, § 1, *reprinted in* Ark. Code Ann. Constitutions 520 (1987).

The 1864 Constitution reverted to the language used in the 1836 Constitution. *See* Ark. Const. of 1864, art. VIII, § 1, *reprinted in* Ark. Code Ann. Constitutions, at 543. The Reconstruction Constitution in 1868 contained an Education Article that mandated a common school system, provided for the distribution of school funds, created a public officer responsible for the school system, and detailed how a common fund for the school system should be created and financed. The relevant language read:

> A general diffusion of knowledge and intelligence among all classes being essential to the preservation of the rights and liberties of the people, the General Assembly shall establish and maintain a system of free schools, for the gratuitous instruction of all persons in this State between the ages of five and twenty-one years, and the funds appropriated for the support of common schools shall be distributed to the several counties in proportion to the number of children and youths therein . . . .

Ark. Const. of 1868, art. IX, § 1, *reprinted in* Ark. Code Ann. Constitutions, at 567.

Following reconstruction, the 1874 Constitution contained the following clause:

> Intelligence and virtue being the safeguards of liberty and the bulwark of a free and good government, the State shall ever maintain a general, suitable, and efficient system of free schools whereby all persons in the State between the ages of six and twenty-one years may receive gratuitous instruction.

Ark. Const. of 1874, art. 14, § 1. After Amendment 53 was adopted in 1968, we have the Education Article as we know it today.

That education has been of paramount concern to the citizens of this state since the state's inception is beyond dispute. It is safe to say that no program of state government takes precedence over it. In 1983, this court emphasized that "[e]ducation becomes the essential prerequisite that allows our citizens to be able to appreciate, claim and effectively realize their established rights." *DuPree v. Alma Sch. Dist. No. 30*, 279 Ark. at 346, 651 S.W.2d at 93. We further said in *DuPree* that "we believe the right to equal educational opportunity is basic to our society." *Id.* However, we shied away in *DuPree* from proclaiming education to be a fundamental right of each school child under the Education Article of our constitution. Indeed, the *DuPree* decision primarily dealt with the disparity in equal educational opportunity caused by the school-funding system and not with whether the system was inadequate under the Education Article.

### d. Constitutional Duty

Our constitutional history underscores the point that education has always been of supreme importance to the people of this state. The General Assembly recognized this in 1997, when it acknowledged that the state is constitutionally required to provide a general, suitable, and efficient system of free public schools, and that the Arkansas courts have held that obligation to be a "paramount duty." *See* Act 1307 of 1997, § 1 (d)(1-2), codified at Ark. Code Ann. § 6-20-302(d)(1-2) (Repl. 1999). There is no ques-

tion in this court's mind that the requirement of a general, suitable, and efficient system of free public schools places on the State an absolute duty to provide the school children of Arkansas with an adequate education. The next question, however, is whether this language also implies a fundamental right vested in the people of this state so as to require strict scrutiny of all legislative actions regarding it.

In resolving this question, we look first to the Arkansas Constitution. Article 2 of the Constitution, entitled *Declaration of Rights*, deals with the personal rights vested in the people of this state, including equality, free speech and free press, the right to trial by jury, the right to due process and bail, the right to be protected against self-incrimination and double jeopardy, the right to be protected against unreasonable searches and seizures, and the right to religious freedom. The Education Article is found in a separate article, Article 14, and it is couched in terms of the state's duty and not in terms of a personal right vested in the people. This court has said repeatedly that in construing the language of our constitution, we must give the language its plain, obvious, and common meaning. *See, e.g., Maddox v. City of Fort Smith*, 346 Ark. 209, 56 S.W.3d 209 (2001); *Daniel v. Jones*, 332 Ark. 489, 966 S.W.2d 226 (1998). Nonetheless, Lake View and the intervening school districts urge that a fundamental right can be implied from the language of Article 14. *See, e.g., Claremont Sch. Dist. v. Governor*, 142 N.H. 462, 703 A.2d 1353 (1997) (constitution's specific charge to legislature to provide education is sufficient to afford fundamental-right status to beneficiaries of that duty).

Other states in the last decade have wrestled with the issue of whether education is a fundamental right under the Education Article of their state constitutions, thus necessitating strict scrutiny of all legislative actions affecting education. Of course, the education language in each state constitution varies. Some states that have found their school-funding systems to be inadequate under their respective education articles simply have not addressed the issue of whether an adequate education is a fundamental right. *See, e.g., DeRolph v. State*, 78 Ohio St. 3d 193, 677 N.E.2d 733 (1997); *McDuffy v. Secretary of the Executive Office of Educ.*, 415

Mass. 545, 615 N.E.2d 516 (1993); *Edgewood Indep. Sch. Dist. v. Kirby*, 804 S.W.2d 491 (Tex. 1991).

This reluctance to discuss the matter, no doubt, is due in large part to the difficulty surrounding this issue. The Arizona Supreme Court commented directly on the confusion involved in the fundamental-right question. It noted that in one of its earlier decisions in 1973, it proclaimed that education was a fundamental right, but in the same opinion, upheld the existing school financing scheme, using the rational basis test rather than examining the system under strict scrutiny. *See Roosevelt Elementary Sch. Dist. No. 66 v. Bishop*, 179 Ariz. 233, 877 P.2d 806 (1994) (questioning *Shofstall v. Hollins*, 110 Ariz. 88, 515 P.2d 590 (1973)). The Arizona Supreme Court determined, however, that it need not resolve this "conundrum," because the Arizona Constitution placed a *specific* duty and responsibility on the Legislature to establish and maintain the public school system. *Id.* The issue was whether the present financing system satisfied the constitutional mandate of a general and uniform school system and not what standard should be applied in judicial review.

The Tennessee Supreme Court found its state school-funding system unconstitutional under the equal protection provisions of its constitution and, thus, refrained from deciding whether an adequate education was a fundamental right under its Education Article. *See Tennessee Small Sch. Sys. v. McWherter*, 851 S.W.2d 139 (Tenn. 1993). Similarly, the Vermont Supreme Court held that an adequate education was essential under its state constitution, but it did not proclaim it to be a fundamental right. *See Brigham v. State*, 166 Vt. 246, 692 A.2d 384 (1997). The court proceeded, however, to hold that its system "violate[d] the right to equal educational opportunities" under both its Education Article and equal protection clause, and that there was no rational basis for the gross inequities in the educational opportunities offered to school children in different school districts in that state. *Id.* at 268, 692 A.2d at 397.

On the other hand, the New Hampshire Supreme Court has held that an adequate education is a fundamental right in that state:

We hold that in this State a constitutionally adequate public education is a fundamental right. In so doing we note that "[t]he right to an adequate education mandated by the constitution is not based on the exclusive needs of a particular individual, but rather is a right held by the public to enforce the State's duty." *Claremont I*, 138 N.H. at 192, 635 A.2d at 1381.

We emphasize that the fundamental right at issue is the right to a State funded constitutionally adequate public education. It is not the right to horizontal resource replication from school to school and district to district. The substance of the right may be achieved in different schools possessing, for example, differing library resources, teacher-student ratios, computer software, as well as the myriad tools and techniques that may be employed by those in on-site control of the State's public elementary and secondary school systems. But when an individual school or school district offers something less than educational adequacy, the governmental action or lack of action that is the root cause of the disparity will be examined by a standard of strict judicial scrutiny.

*Claremont Sch. Dist.*, 142 N.H. at 473-74, 703 A.2d at 1359. The New Hampshire court then viewed the *Rose* standards "as benchmarks of a constitutionally adequate public education." *Id.* at 475, 703 A.2d at 1359. *See also Rose v. Council for Better Educ., Inc.*, *supra* (holding in 1998 that an adequate education was a fundamental right under its Education Article). Similarly, the Wyoming Supreme Court affirmed an earlier decision in *State v. Campbell County Sch. Dist.*, 19 P.3d 518 (2001), and reiterated that "[b]ecause education is a fundamental right and our citizens are entitled to equal protection under our state constitution, all aspects of the school finance system are subject to strict scrutiny, and statutes establishing the school financing system are not entitled to any presumption of validity." 19 P.3d at 535.

Turning to our authority in Arkansas, the seminal school-funding case, *DuPree v. Alma Sch. Dist. No. 30*, *supra*, did not measure the school-funding system against the Education Article but rather did so under the equality provisions of the state constitution. In doing so, this court stated that it was not necessary to decide whether education was a fundamental right because "we can find no constitutional basis for the present system, as it has no rational bearing on the educational needs of the district." *DuPree*,

279 Ark. at 346, 651 S.W.2d at 93. In other words, because the system failed for lack of a reasonable and legitimate governmental purpose to support it, it was not necessary to use a heightened standard of review like strict scrutiny to examine the system's constitutionality. Judge Imber used the same reasoning when she ruled that the current funding system was unconstitutional in her 1994 order. She found it unnecessary to decide whether an adequate education was a fundamental right for purposes of adequacy and inequity, since the school-funding system failed to pass constitutional muster even using a rational-basis standard.

 In his 2001 order, Judge Kilgore did not specifically state that an adequate education was a fundamental right under the Education Article. However, he did rule that he would apply a strict-scrutiny analysis to the state's legislation to decide whether there was constitutional compliance. Strict scrutiny usually goes hand-in-hand with a claim that a fundamental right has been impaired. *See, e.g., Jegley v. Picado*, 349 Ark. 600; 80 S.W.3d 332 (2002) (the right to privacy for private sex between consenting adults was deemed a fundamental right where strict scrutiny would be the standard regarding any impairment). Judge Kilgore also announced at a pretrial hearing "that language in the Constitution is consistent with and supports the proposition that the State of Arkansas has a compelling interest in seeing that our children get adequate educations, or general, suitable and efficient education. . . . That being the case, the standard that the State will be held to in showing that we do have an adequate system of education will be strict scrutiny."

With the exceptions of New Hampshire, *see Claremont Sch. Dist. v. Governor, supra*, and Kentucky, *see Rose v. Council for Better Educ., Inc., supra*, most states in recent years have avoided proclaiming that an adequate education is a fundamental right because that carries with it the obligation of the courts to examine and scrutinize all legislation respecting education strictly. We must admit to some apprehension about using a strict-scrutiny standard, because it has never been this court's constitutional function to micromanage the public schools of this state or even to retain jurisdiction over the public school system until, in our judgment, an adequacy standard has been achieved.

At the same time, this court is troubled by four things: (1) the Department of Education has not conducted an adequacy study; (2) despite this court's holding in *DuPree v. Alma Sch. Dist. No. 30, supra,* that equal opportunity is the touchstone for a constitutional system and not merely equalized revenues, the State has only sought to make revenues equal; (3) despite Judge Imber's 1994 order to the same effect, neither the Executive branch nor the General Assembly have taken action to correct the imbalance in ultimate expenditures; and (4) the State, in the budgeting process, continues to treat education without the priority and the preference that the constitution demands. Rather, the State has continued to fund the schools in the same manner, although admittedly taking more steps to equalize revenues. This being said, perhaps the recalcitrance of the State to reform the school-funding system is reason enough to adopt the heightened standard of strict scrutiny.

Nevertheless, because we conclude that the clear language of Article 14 imposes upon the State an absolute constitutional duty to educate our children, we conclude that it is unnecessary to reach the issue of whether a fundamental right is also implied. Many states, as we have already discussed, appear to get lost in a morass of legal analysis when discussing the issue of fundamental right and the level of judicial scrutiny. This court is convinced that much of the debate over whether education is a fundamental right is unnecessary. The critical point is that the State has an absolute duty under our constitution to provide an adequate education to each school child. Like the Vermont and Arizona Supreme Courts, we are persuaded that that duty on the part of the State is the essential focal point of our Education Article and that performance of that duty is an absolute constitutional requirement. *See Brigham v. State, supra; Roosevelt Elementary Sch. Dist. No. 66 v. Bishop, supra.* When the State fails in that duty, which we hold today is the case, our entire system of public education is placed in legal jeopardy. Should the State continue to fail in the performance of its duty, judicial scrutiny in subsequent litigation will, no doubt, be as exact as it has been in the case before us.

■ For the foregoing reasons, we conclude that the State has not fulfilled its constitutional duty to provide the children of this state with a general, suitable, and efficient school-funding system. Accordingly, we hold that the current school-funding system violates the Education Article of the Arkansas Constitution, and we affirm the trial court on this point.

## VI. Equality

The State next argues that the trial court erred in finding that the school-funding system was inequitable. On this point, the State contends that there are two types of equity: (1) horizontal, or dollar, equity where the State equalizes per-student revenues available across the state; and (2) vertical equity where efforts are made by the State to meet the special needs of certain students through categorical funding, such as the English-as-a-second language program, special education, gifted-and-talented programs, and vocational-technical training. According to the State, it is virtually impossible to equalize all revenues when special needs come into play and when certain value judgments must be made.

The State further maintains that it has met the Federal Range Ratio test and the GINI Index of Inequality for equal revenues available per student. Equal revenues per student is the correct test for equality, according to the State, and, thus, the trial court erred in concluding that the test for equality is the *actual money spent* per student rather than state money made available to the school districts. Finally, the State argues that any disparity in the wealth of the school districts is offset by two legitimate governmental purposes in funding the schools the way it does: (1) the necessity to fund other state programs, and (2) local control of public schools by the school districts.[8]

■ There is no doubt in our minds that there is considerable overlap between the issue of whether a school-funding system is inadequate and whether it is inequitable. Deficiencies in certain

---

[8] At least two post-1994 legislative Acts specifically refer to the desirability of local control. *See* Act 1307 of 1997, codified at Ark. Code Ann. § 6-20-302(b) (Repl. 1999) and Act 917 of 1995.

public schools in certain school districts can sustain a finding of inadequacy but also, when compared to other schools in other districts, a finding of inequality. Bearing that in mind, we first address whether state *revenues* paid to the school districts under the school-funding formula is the test for deciding equality or whether the test is actual *expenditures* spent on the students. We conclude it is the latter and that the trial court was correct in so determining. The Arkansas Constitution has the following provisions guaranteeing equal treatment to its citizenry under the law:

§ 2. Freedom and independence.

All men are created equally free and independent, and have certain inherent and inalienable rights, amongst which are those of enjoying and defending life and liberty; of acquiring, possessing and protecting property and reputation, and of pursuing their own happiness. To secure these rights governments are instituted among men, deriving their just powers from the consent of the governed.

§ 3. Equality before the law.

The equality of all persons before the law is recognized, and shall ever remain inviolate; nor shall any citizen ever be deprived of any right, privilege or immunity, nor exempted from any burden or duty, on account of race, color or previous condition.

. . .

§ 18. Privileges and immunities — Equality.

The General Assembly shall not grant to any citizen or class of citizens privileges or immunities which upon the same terms shall not equally belong to all citizens.

Ark. Const. art. 2, §§ 2, 3, 18.

▪▪▪ The answers to many of the State's arguments can be found in our decision of *DuPree v. Alma Sch. Dist. No. 30, supra,* which, again, was handed down almost twenty years ago. In *DuPree,* we found that the school-funding system then in existence violated the three equality provisions set out above. We first referred to "the undisputed evidence that there are sharp disparities among school districts in the *expenditures* per pupil and the education opportunities available as reflected by staff, class size, curriculum, remedial services, facilities, materials and equipment." *DuPree,* 279 Ark. at 344, 651 S.W.2d at 92 (emphasis

added). With respect to whether local control by the school districts was a legitimate government interest or rational basis for disparities in educational opportunity among the school districts, we said: "[W]e can find no constitutional basis for the present system, as it has no rational bearing on the educational needs of the district." *Id.* at 346, 651 S.W.2d at 93. In holding that the system was unconstitutional, we said: "We come to this conclusion in part because we believe the right to equal educational opportunity is basic to our society." *Id.*, 651 S.W.2d at 93. We added: "For some districts to supply the barest necessities and others to have programs generously endowed does not meet the requirements of the constitution. Bare and minimal sufficiency does not translate into equal educational opportunity." *Id.* at 347, 651 S.W.2d at 93. We concluded: "If local government fails, the state government must compel it to act, and if the local government cannot carry the burden, the state must itself meet its continuing obligation." *Id.* at 349, 651 S.W.2d at 95 (quoting *Robinson v. Cahill*, 303 A.2d 273, 275 (N.J. 1973)).

It is clear to this court that in *DuPree*, we concentrated on expenditures made per pupil and whether that resulted in equal educational opportunity as the touchstone for constitutionality, not on whether the revenues doled out by the State to the school districts were equal. We were clearly interested in *DuPree*, as we are here today, on what money is actually being spent on the students. That is the measuring rod for equality. Both Judge Imber in 1994 and Judge Kilgore in 2001 concluded that that was the case. Equalizing revenues simply does not resolve the problem of gross disparities in per-student spending among the school districts. It provides an educational floor of money made available to the school districts but in no way corrects the inherent disparity between a wealthy school district that can easily raise additional school funds for educational enhancement by passing millage increases far in excess of the 25 mill uniform rate and poorer school districts that are only offering, as we said in *DuPree*, the "barest necessities." 279 Ark. at 347, 651 S.W.2d at 93. We agree

that the focus for deciding equality must be on the actual expenditures.[9] We affirm Judge Kilgore on this point.

Looking then to the end result of expenditures actually spent on school children in different school districts, we quickly discern inequality in educational opportunities. The deficiencies in Lake View and Holly Grove have already been noted. In both those districts, the curriculum offered is barebones. Contrast the curriculum in those school districts with the rich curriculum offered in the Fort Smith School District, where advanced courses are offered and where specialty courses such as German, fashion merchandising, and marketing are available. The inequality in educational opportunity is self-evident.

The same holds true for buildings and equipment. Whether a school district has rainproof buildings, sufficient bathrooms, computers for its students, and laboratory equipment that functions is all a matter of money. Certain schools in Fort Smith, for example, do not suffer from such deficiencies. Other schools in the Delta and in Northwest Arkansas where the student population is exploding are experiencing dire facility and equipment needs.

Again, we turn to Dr. Simon's assessment of the situation:

> MR. LEWELLEN: Is it your — is it your opinion that a child who lives in a poor district because of the property wealth values are low should be in a facility which is sub-standard to the facilities that are located in property wealthy districts?
>
> DR. SIMON: I don't think that's fair.
>
> MR. LEWELLEN: Do you agree with me that that situation existed in 1994 in the State of Arkansas?
>
> DR. SIMON: Yes.
>
> MR. LEWELLEN: And do you agree with me that that situation exists today in 2000 in the State of Arkansas?

---

[9] We further note that federal regulations pertaining to the calculation of the disparity limitation under the Federal Range Ratio permit the Secretary of Education to calculate the percentage of disparity using either revenues or expenditures. *See* 34 C.F.R. § 222.63(a) (1994).

DR. SIMON: Yes.

MR. LEWELLEN: And do you agree that based on that fairness that the State of Arkansas still has not passed a formula where it is responsible for constructing a cure for those situations in the poor districts?

DR. SIMON: Outside the parameters that have been set.

MR. LEWELLEN: Do you agree with me, they have not established a system to correct the problem?

DR. SIMON: Not to the — not to the extent you're talking about, that's correct.

. . . .

MR. LEWELLEN: Okay. Now, is it your opinion that all children have — well, you've said that you believe facilities has something to do with the education of a child, right?

DR. SIMON: Yes.

MR. LEWELLEN: And I think you would agree that you think materials and other resources has something to do with the ability of a child to learn.

DR. SIMON: Yes.

MR. LEWELLEN: Okay. Then that being the case, do you think that all children in this State have equal physical facilities?

DR. SIMON: No.

MR. LEWELLEN: Do you think all children in this State have equal materials and resources in every district?

DR. SIMON: No.

The discrepancies in teacher salaries among Arkansas school districts have already been noted in this opinion. Well-paid and well-motivated teachers are what make the education engine run. Dr. Simon candidly admitted this in his testimony and also testified:

MR. LEWELLEN: But you're not paying your teachers equally across the State?

DR. SIMON: No.

In the face of this testimony, the State makes the implausible argument that more money spent on education does not correlate to better student performance. This position is contrary to Judge Imber's finding in her 1994 order and to the Tennessee Supreme Court: "[T]here is a 'direct correlation between dollars expended and the quality of education a student receives.'" *McWherter*, 851 S.W.2d at 141. The State's argument is farfetched in this court's opinion. We are convinced that motivated teachers, sufficient equipment to supplement instruction, and learning in facilities that are not crumbling or overcrowded, all combine to enhance educational performance. Certainly, Dr. Simon's testimony confirms that. All of that takes money.

The State's retort on the variations in revenue among school districts is that Amendment 74 specifically contemplates variations and authorizes them. It is true that Amendment 74 states: "The primary reason for allowing such variations is to allow school districts, to the extent permissible, to raise additional funds to enhance the educational system within the school district." However, Amendment 74 does not authorize a system of school funding that fails to close the gap between wealthy school districts with premier educational programs and poor school districts on the lower end of the economic spectrum, which are mired in poverty and unable to provide a system of education much above the most elementary kind.

The initial inquiry in our equality analysis is whether school districts are impermissibly classified on the basis of wealth so that discrimination exists. We hold that a classification between poor and rich school districts does exist and that the State, with its school-funding formula, has fostered this discrimination based on wealth. Having identified the classification created by the school-funding formula, the next issue is what level of judicial scrutiny will be employed in this case. Two levels are offered by the parties. The heightened level is strict scrutiny under which the State would have to show, first, that it has a compelling interest to support disparate treatment in funding between school districts and, secondly, that the school-funding system is narrowly tailored to serve that interest. *See, e.g., Shaw v. Hunt*, 517 U.S. 899 (1996); *Pridgeon v. State*, 266 Ark. 651, 587 S.W.2d 225 (1979) ("Only

when a classification is based on a suspect category . . . will strict scrutiny, a more demanding standard of review, be applied."). The less severe level is rational-basis review, where the question is whether there is merely a legitimate governmental purpose behind the disparate treatment in school funding between school districts, and whether the current school-funding system bears a rational relationship to that purpose. *See, e.g., San Antonio Indep. Sch. Dist. v. Rodriguez,* 411 U.S. 1 (1973); *Jegley v. Picado, supra.*

██ ██ Strict-scrutiny review is unwarranted in this case. We have never considered school districts to be a suspect class for purposes of an equal-protection analysis. *See DuPree v. Alma Sch. Dist. No. 30, supra. See also San Antonio Indep. Sch. Dist. v. Rodriguez, supra.* We hold, once again, that requiring the State to show a compelling interest to support the classification is unnecessary in this case, because the State fails to justify the classification even under the more modest rational-basis standard. *See DuPree v. Alma Sch. Dist. No. 30, supra.*

██ We turn then to the State's contention that even though disparities in educational opportunities may exist due to the property wealth of the individual districts, there are legitimate government purposes or rational bases for this. Those purposes, according to the State, are local control and other state programs. We rejected the argument of local control in *DuPree* in no uncertain terms and stated that such reasoning was illusory because deference to local control has nothing to do with whether educational opportunities are equal across the state. It is the General Assembly's constitutional duty, not that of the school districts, to provide equal educational opportunity to every child in this state. Furthermore, the State's claim that the General Assembly must fund a variety of state programs in addition to education and that this is reason enough for an inferior education system hardly qualifies as a legitimate reason.

It has long been the State's position that its duty is fulfilled under the state constitution if it pays school districts an equal amount in revenues on a per-student basis and then defers to local control as to how that money is spent. Nothing could be farther from the truth. It is the States's responsibility to provide an equal

education to its school children and, as we said in *DuPree*, "[i]f local government fails, the state government must compel it to act." 279 Ark. at 349, 651 S.W.2d at 95 (quoting *Robinson v. Cahill, supra*). Deference to local control is not an option for the State when inequality prevails, and deference has not been an option since the *DuPree* decision.

██ ██ It is the State's responsibility, first and foremost, to develop forthwith what constitutes an adequate education in Arkansas. It is, next, the State's responsibility to assess, evaluate, and monitor, not only the lower elementary grades for English and math proficiency, but the entire spectrum of public education across the state to determine whether equal educational opportunity for an adequate education is being substantially afforded to Arkansas' school children. It is, finally, the State's responsibility to know how state revenues are being spent and whether true equality in opportunity is being achieved. Equality of educational opportunity must include as basic components substantially equal curricula, substantially equal facilities, and substantially equal equipment for obtaining an adequate education. The key to all this, to repeat, is to determine what comprises an adequate education in Arkansas. The State has failed in each of these responsibilities.

██ We hold that the trial court did not err in concluding that the current school-funding system violates the equal-protection sections of the Arkansas Constitution in that equal educational opportunity is not being afforded to the school children of this state and that there is no legitimate government purpose warranting the discrepancies in curriculum, facilities, equipment, and teacher pay among the school districts. It is clear to this court that, as we indicated in *DuPree*, whether a school child has equal educational opportunities is largely an accident of residence. We affirm the trial court on this point.

### VII. Early Childhood Education

The State argues that while it may agree that as a matter of public policy pre-kindergarten programs may be one way to increase student achievement, it does not agree that such programs

are mandated by the Arkansas Constitution. The State contends that Article 14, § 1, contemplates that public funds may be expended for education beyond grades one through twelve, but it does not mandate it. Rather, the State maintains, the constitution's language is permissive and gives authority not only to the General Assembly but also to local school districts to implement pre-kindergarten programs as they see fit. The State asserts that determinations as to what types of programs are best to promote student achievement should be made by the entities entrusted to make them by the state constitution, and those entities are the General Assembly and the public school districts, not the courts.

Lake View responds that this court should apply constitutional remedies to the case at hand. It further asserts that the trial court's ruling simply states that under the provisions of Arkansas Constitution Article 2, §§ 2, 3, and 18, the State must provide equal access to pre-school education, if the State is already either directly or indirectly financing some school districts that are providing early childhood education.

The Little Rock, Rogers, and Bentonville Intervenors also respond that the State's arguments might have some merit but for the uncontroverted testimony that the State cannot provide a constitutionally adequate education for students age six and older unless it establishes a program of pre-kindergarten education. The Intervenors' position, in a nutshell, is that if a child starts out behind due to no pre-school education, that child never makes up the lost ground. The Intervenors concede that Article 14 on its face does not mandate public education for students under the age of six. The Intervenors urge, however, that the State is required to "adopt all suitable means to secure to the people the advantages and opportunities of education[,]" under Article 14, and early-childhood education is clearly a suitable means. As a final point, the Intervenors emphasize that there was no evidence presented at trial to rebut the testimony of educators and experts that early-childhood education is a necessary component of an education system which reasonably expects to enable significant numbers of students to perform at grade level. It is also the most efficient way for the State to fulfill that expectation, according to the Intervenors.

The State's argument, boiled down to its essence, is that the plain language of Article 14, § 1, does not mandate the chancery court's order of State-provided, early-childhood education. We agree. Section 1 reads in pertinent part that the General Assembly and public school districts "may spend public funds for the education of persons over twenty-one (21) years of age and under six (6) years of age, as may be provided by law, and no other interpretation shall be given to it."

In its order, the trial court found:

> 7. Three facts were uncontroverted at trial: 1) A substantial number of our children are entering kindergarten and first grade significantly behind their peers; 2) Those children that enter the first grades needing remediation will have a difficult time performing at grade level by the third grade; and 3) If a student cannot perform at grade level, especially in reading, by the third grade, then he is unlikely to ever do so. The only possible conclusion is that in order to provide our children with an adequate education as required by the Constitution and ACTAPP, the State must forthwith provide programs for those children of pre-school age that will allow them to compete academically with their peers. The urgency of this need equals that of the deficiency in teacher salaries.

Later in its opinion, the trial court wrote that forming remedies was not the role of the courts, and courts should not proclaim remedies unless all else fails. The trial court concluded that "for now" these matters are "left to the legislature."

But aside from the fact that Article 14 does not require early childhood education and leaves that matter to the General Assembly, the trial court could not order the implementation of pre-school programs in any event. That is a public-policy issue for the General Assembly to explore and resolve. It is elementary that the powers of our state government are divided into three separate branches of government. *See* Ark. Const. art. 4, § 1. The state constitution further provides that one branch of government shall not exercise the power of another. *See* Ark. Const. art. 4, § 2.

■ This court has said that the legislature can neither be coerced nor controlled by judicial power. *See Wells v. Purcell*, 267 Ark. 456, 592 S.W.2d 100 (1979). In *Wells*, we commented on the remedies being left to the legislature and not to the courts:

> The legislature is responsible to the people alone, not to the courts, for its disregard of, or failure to perform, a duty clearly enjoined upon it by the constitution, *and the remedy is with the people, by electing other servants, and not through the courts.*

*Wells v. Purcell*, 267 Ark. at 462, 592 S.W.2d at 104 (emphasis added). We then said:

> It must always be remembered that the state's constitution is neither an enabling act nor a grant of enumerated powers, and the legislature may rightfully exercise the power of the people, subject only to restrictions and limitations fixed by the constitutions of the United States and this state. Under our system of government the legislature represents the people and is the reservoir of all power not relinquished to the federal government or prohibited by the state constitution.

*Wells*, 267 Ark. at 464, 592 S.W.2d at 105 (internal citations omitted).

■ While it is uncertain whether the trial court, in its order, was underscoring the need for pre-school education or ordering its implementation, we hold that the trial court had no power to do the latter. Nor do we agree with the Intervenors that the courts of this state can mandate pre-school education as an essential component of an adequate education. That, again, is for the General Assembly and the school districts to decide. Article 14 contemplates that very thing when it refers to funding pre-six-year-old programs, as provided "by law."

## VIII. Lake View's Arguments

We turn next to the various arguments raised by Lake View in its appeal.

### a. 1994 Order As Law of the Case

█ Lake View first claims that law of the case, *res judicata*, laches, estoppel, and Ark. R. Civ. P. 60 should have been applied by the trial court at the compliance trial. Lake View, however, fails to discuss or develop the latter four doctrines in its brief on appeal.[10] It is incumbent on an appellant to develop issues for purposes of appeal, as we will not consider assignments of error that are unsupported by convincing legal authority or argument. *See Porter v. Harshfield*, 329 Ark. 130, 948 S.W.2d 83 (1997). Accordingly, this court will only address the point raised regarding law of the case.

██ Last term, this court discussed the doctrine of law of the case:

> The venerable doctrine of law of the case prohibits a court from reconsidering issues of law and fact that have already been decided on appeal. The doctrine serves to effectuate efficiency and finality in the judicial process. *Frazier v. Fortenberry*, 5 Ark. 200 (1843); *see also*, 5 AM. JUR. 2D *Appellate Review* § 605 (1995). We have said the following with regard to the law-of-the-case doctrine:
>
> > The doctrine provides that a decision of an appellate court establishes the law of the case for the trial upon remand and for the appellate court itself upon subsequent review. *Kemp v. State*, 335 Ark. 139, 983 S.W.2d 383 (1998). On the second appeal, the decision of the first appeal becomes the law of the case, and is conclusive of every question of law or fact decided in the former appeal, and also of those which might have been, but were not, presented. *Griffin v. First Nat'l Bank*, 318 Ark. 848, 888 S.W.2d 306 (1994).
>
> *Clemmons v. Office of Child Support Enforcement*, 345 Ark. 330, 346, 47 S.W. 3D 227, 237 (2001).

*Cadillac Cowboy, Inc. v. Jackson*, 347 Ark. 963, 970, 69 S.W.3d 383, 388 (2002). In *Jackson*, we made it clear that the doctrine

---

[10] Lake View does make one conclusory allegation regarding Rule 60: "Rule 60 prevented the [S]tate . . . from seeking modification, amendment, or nullification of any part of the 1994 [O]rders[.]"

governs issues of law and fact concluded in the first appeal. We have further held that the doctrine is "conclusive only where the facts on the second appeal are substantially the same as those involved in the prior appeal." *Wilson v. Wilson*, 301 Ark. 80, 82, 781 S.W.2d 487, 488 (1989). Thus, it does not apply if there is a material change in the facts. *See id.*

 Lake View appears to be contending that the trial court in 2001 was bound by the 1994 order as law of the case. We disagree. The 1994 order was not appealed, but, even more importantly, there has been a material change in the school-funding landscape between the time of the 1994 order and the trial court's 2001 order. We have already discussed the 1995 and 1997 acts as well as Amendment 74, which was adopted by vote of the people in 1996. The issue at the compliance trial and before this court on appeal is whether the State is now in compliance with the state constitution by virtue of what it has done since 1994. The 1994 order, while instructive on certain points, was simply not binding on the trial court in 2001. We affirm the trial court on this point.

*b. Desegregation Funds*

Lake View next contests the failure of the trial court to include the desegregation money provided to the Pulaski County School Districts for purposes of the Federal Range Ratio to decide disparities in funding among the school districts. On this point, Judge Imber in her 1994 order included the desegregation funds under the formula, while Judge Kilgore excluded them in his 2001 order. We agree with Judge Kilgore that the money should not be included.

In making his decision, Judge Kilgore cited *Magnolia Sch. Dist. No. 14 v. Arkansas State Bd. of Educ.*, 303 Ark. 666, 799 S.W.2d 791 (1990). The State, in addition, cites this court to a later Eighth Circuit Court of Appeals opinion, *Little Rock Sch. Dist. v. Pulaski County Special School Dist.*, 83 F.3d 1013 (8th Cir. 1996). We believe that the Eighth Circuit case supports the trial court's decision.

In the *Little Rock Sch. Dist.* case, the Eighth Circuit discussed the fact that the state desegregation funds were "in addition to" existing state aid:

> The theme of the [Little Rock Schools Desegregation] Settlement Agreement was that the Pulaski County districts would receive the desegregation payments included in the agreement *in addition to* other state aid that they would have received. The language we previously cited expresses that theme, as does the statement that "[t]he funds paid by the State under this agreement are not intended to supplant any existing or future funding which is ordinarily the responsibility of the State of Arkansas." [Settlement Agreement] § II, paragraph E.

83 F.3d at 1019 (emphasis in original). According to this description, the state desegregation funds were separate and apart from normal state aid to education.

 We agree that the desegregation funds do not constitute "state aid." Under federal regulations, "state aid" is defined as "any contribution, no repayment for which is expected, which is made by a State to or on behalf of local educational agencies within the State for current expenditures in the provision of free public education[.]" 34 C.F.R. § 222.61(d)(1) (1994).

We agree with the trial court that the desegregation money was not "state aid" for current expenditures and should not form part of state funds for purposes of the Federal Range Ratio test. Judge Imber's conclusion to the contrary in her 1994 order was not law of the case, as already decided in this opinion. Lake View has simply failed to convince this court that Judge Kilgore erred in his legal conclusion. As a result, we affirm the trial court on this point.

c. *Weighted Average Daily Membership*

Lake View also advances the claim that Judge Kilgore erred in not reverting to the 1994 school-funding formula, which used weighted average daily membership as opposed to categorical grants and aid. Again, Lake View posits that Judge Imber's 1994 order is law of the case, and her use of weighted average daily membership in the funding formula must be followed.

We disagree that *weighting* average daily membership is still a viable part of the school-funding formula. In 1995, the General Assembly changed the formula and substituted categorical grants and aid for the previous system where fictitious students were added to average daily school membership as a means of paying for the special needs of that school district. *See* Act 1194 of 1995.

The new school-funding formula is what Judge Kilgore measured against constitutional mandates. It would make no sense for him to determine compliance by examining the constitutionality of a formula that had been repealed by the General Assembly. We have previously held in this opinion that the 1994 order is not law of the case. Lake View's argument has no merit.

### d. Excess Debt Millages

Lake View urges that the trial court erred in upholding Act 1300 of 1997, codified at Ark. Code Ann. § 26-80-204(18) (Supp. 2001), which authorized school districts to subtract excess debt millages against the uniform tax of 25 mills owed to the State under Amendment 74.

Lake View's point appears to have merit. Amendment 74 provides in pertinent part:

> (b)(1) There is established a uniform rate of ad valorem property tax of twenty-five (25) mills to be levied on the assessed value of all taxable real, personal, and utility property in the state to be used solely for maintenance and operation of the schools.
>
> (2) Except as provided in this subsection the uniform rate of tax shall not be an *additional* levy for maintenance and operation of the schools but shall replace a portion of the existing rate of tax levied by each school district available for maintenance and operation of schools in the school district. The rate of tax available for maintenance and operation levied by each school district on the effective date of this amendment shall be reduced to reflect the levy of the uniform rate of tax. If the rate of tax available for maintenance and operation levied by a school district on the effective date of this amendment exceeds the uniform rate of tax, the excess rate of tax shall continue to be levied by the school district until changed as provided in subsection (c)(1). If the rate of tax available for maintenance and operation levied by a school

district on the effective date of this amendment is less than the uniform rate of tax, the uniform rate of tax shall nevertheless be levied in the district.

Ark. Const. amend. 74 § (b)(1-2) (emphasis added).

What the General Assembly did by § 26-80-204(18) was change what comprises the millage requirement.. Under Amendment 74, the uniform millage rate generates money solely for the maintenance and operation of the schools. Section 26-80-204(18), however, adds a new category, excess debt service millage, to meet each school district's obligation. Subsection (18) reads:

> (18) "Uniform rate of tax" means a uniform rate of ad valorem property tax of twenty-five (25) mills to be levied on the assessed value of all taxable real, personal, and utility property in the state to be used solely for maintenance and operation of the schools. In calculating the uniform rate of tax imposed by Arkansas Constitution, Article 14, § 3, as amended by Arkansas Constitution, Amendments 11, 40, and 74, the following categories of millage may be utilized to meet the minimum millage requirement:
>
> (A) The local school district's maintenance and operation millage;
>
> (B) The dedicated maintenance and operation millage;
>
> (C) *Excess debt service millage*; and
>
> (D) The millage derived from the ratio of the debt service funding supplements divided by the total assessment.

Ark. Code Ann. § 26-80-204(18) (Supp. 2001) (emphasis added).

Crediting excess debt service millage against the 25 mill obligation is not contemplated by Amendment 74. Nor can we accept the trial court's explanation for finding § 26-80-204(18)(C) & (D) to be constitutional. The trial court said:

> 5. The plaintiffs have raised the issue that Amendment 74 and Article 2, §§ 2, 3, and 18 have been violated by allowing under A.C.A. § 26-80-201 et seq. school districts to use the excess debt millages to satisfy the uniform tax rate of 25 mills. However, the court finds otherwise. Plaintiffs' argument is that Amendment 74 requires school districts to levy twenty-five mills to be dedicated to maintenance and operations, and that by fail-

ing to do so the State loses substantial sums of money that would otherwise be available for Arkansas public schools. Some school districts have levied various millages in order to secure debt incurred through bond issues. Because of the requirement that millages dedicated to the retirement of debt be equal to 150% of the indebtedness there are virtually always excess debt millages. In fact, it is represented in the bond indenture, and, therefore, the voters must be presumed to know that the excess millages are to be available for maintenance and operations.

Plaintiffs complain that this use of excess debt service mills does not satisfy Amendment 74 and that the amendment requires each school district to levy twenty-five mills, independent of any other mills, exclusively for maintenance and operations. However, Amendment 74 (b)(2) states in part, "Except as provided in this subsection the uniform rate of tax shall not be an additional levy for maintenance and operation of the schools but shall replace a portion of the existing rate of tax levied by each school district available for maintenance and operation of schools . . ."

The Plaintiffs argue for a result that could easily have been obtained by more specific language in the amendment. However, no such language is present, and therefore, the method of counting mills to meet the uniform rate of tax used by the State complies with the language of the Constitution.

In our view, the trial court assumes too much. It assumes, first, that there is always an excess debt service millage and, secondly, that taxpayers have, in effect, authorized by their votes that the excess be applied to maintenance and operation of the schools. Why taxpayers would "authorize" by implication that the excess be used for maintenance and operation and not for some other expense such as another capital expense is not explained by the court.

The record does not reflect how many school districts credit excess debt service millages against the 25 mills owed or even the value of the credits taken across the state. This, of course, is pertinent information that this court would have liked to have had at its disposal, but the State, in opposing Lake View's position, does not argue the financial impact of eliminating the excess–debt–service–millage credit.

 In construing our state constitution, we give words their plain, ordinary, and common meaning. *See Frank v. Barker*, 341 Ark. 577, 20 S.W.3d 293 (2000); *Hoyle v. Faucher*, 334 Ark. 529, 975 S.W.2d 843 (1998). The wording of Amendment 74 makes it abundantly clear that each school district is responsible for assessing a uniform rate of 25 mills for maintenance-and-operation purposes. If a school district already has in effect millages for maintenance and operation, those millages may be counted against the uniform rate of 25 mills required by Amendment 74. Nowhere, however, does Amendment 74 provide that part of a millage adopted by the school district for an entirely different purpose may be subtracted from the 25 mills owed. The General Assembly's legislation permitting excess debt service millage is clearly contrary to the plain meaning of Amendment 74.

The State, in its brief before this court, only addressed Lake View's argument in a footnote. In that footnote, the State maintained that Amendment 74 is not self-executing and that legislation was necessary to put the amendment into effect. Though the State does not make this argument, we note where Amendment 74, subsection (d), provides that "maintenance and operation" means "such expenses for the general maintenance and operation of schools as may be defined by law." Giving the General Assembly authority to define what expenses are included within the term "maintenance and operation," however, does not empower that body to change the uniform millage rate or alter the funds required to be sent to the State under Amendment 74.

 We hold that Ark. Code Ann. § 26-80-204(18)(C) violates Amendment 74 of the Arkansas Constitution and is void and of no effect.

### e. Incentive Award

Lake View next contends that the trial court erred in denying its posttrial request for an incentive award of $10 million. Lake View's primary assertion is that it has driven this litigation since its inception in 1992, and the State has made great strides in education due to its efforts. It cites two cases to support its argument.

*See In Re: Continental Illinois Sec. Litig.*, 962 F.2d 566 (7th Cir. 1992); *Rand v. Monsanto Co.*, 926 F.2d 596 (7th Cir. 1991).

Neither case is persuasive. First, neither case is a school-funding matter involving a monetary claim against a state government. In both cases, the Seventh Circuit Court of Appeals discussed the duties of a class representative, and only *In Re: Continental Illinois Sec. Litig.* did the court address the fact that in some instances, a plaintiff may be entitled to an incentive fee. However, the court in neither case concluded that the plaintiff involved was entitled to an incentive award. In its brief, Lake View failed to cite to a rule for when an incentive award is appropriate or to develop an argument based on that rule. We have said time and again that this court will not research an appellant's argument for it. *See, e.g., Holt v. Wagner*, 344 Ark. 691, 43 S.W.3d 128 (2001).

We finally note that the trial court did not specifically address Lake View's incentive-award claim but issued a blanket denial of all claims not addressed. Regardless, Lake View's failure to develop this point legally or factually is reason enough to affirm the trial court on this issue.

## f. Contempt and Retroactive Funding

Lake View submits that the record clearly establishes that there was an intentional violation of Judge Imber's 1994 order by the State with the passage of the 1995 and 1997 legislative acts. Thus, according to Lake View, a contempt sanction is warranted. Lake View further maintains that retroactive funding by the State to the school districts back to 1994, under the school-funding formula it espouses, is required. However, Lake View leaves this court in the dark as to what that retroactive funding should be and which school districts should receive it.

Again, our failure to embrace Lake View's law-of-the-case argument vis-à-vis Judge Imber's 1994 order largely decides the issue of contempt. Moreover, we are hard pressed to conclude that the State is in contempt of the 1994 order, when we have already concluded that the issue in this appeal is whether the

1995 and 1997 legislation as well as Amendment 74 have brought the state into constitutional compliance.

██ With regard to retroactive funding, Lake View's argument suffers from lack of specificity and citation to authority. We, again, observe that we will not develop an appellant's argument for it or do an appellant's legal research on a point raised. *See Holt v. Wagner, supra.*

This point has no merit, and we affirm the trial court.

### g. Remedies

· ██ Lake View argues generally that the trial court should have ordered specific remedies against the State. What Lake View appears to be arguing is that the trial court should have directed the State to take specific steps to render school funding constitutional. We, however, do not see that as the trial court's or this court's function. Development of the necessary educational programs and the implementation of the same falls more within the bailiwick of the General Assembly and the Department of Education. The Ohio Supreme Court acknowledged the different functions in the branches of government regarding remedies when it said: "[W]e recognize that the proper scope of our review is limited to determining whether the current system meets constitutional muster [and we] refuse to encroach upon the clearly legislative function of deciding what the new legislation will be." *DeRolph v. State*, 78 Ohio St. 3d at 213, n.9, 677 N.E.2d at 747. *See also Tennessee Small Sch. Sys. v. McWherter, supra* (affirming trial court's holding that the appropriate remedy should be fashioned by the General Assembly); *Brigham v. State, supra* (holding that the court's duty was solely to define the impact of the State Constitution on educational funding, not to fashion and impose a remedy; "The remedy at this juncture properly lies with the Legislature.") The trial court's role and this court's role, as previously discussed in this opinion, are limited to a determination of whether the existing school-funding system satisfies constitutional dictates and, if not, why not.

## VIII. Attorneys' Fees

In a separate brief, Lake View vigorously contends that the trial court was in error when it used a "hybrid" method of calculating attorneys' fees which resulted in a fee award of $9,338,035 and no costs. What the trial court should have done, according to Lake View, is award a percentage fee based on a common fund of $130 million, which, it submits, was created by its efforts. Contingent fees ordinarily range from twenty-five percent to forty percent of the common fund, it claims. Thus, its fee award should have been $32,500,000 or $52,000,000. Moreover, Lake View contends that because the benefit to the school districts now exceeds $130 million (almost $311 million), the attorneys' fees awarded should be even higher. Lake View bemoans the fact that the trial court's fee award works out to about six-and-a-half percent of the common fund. Lake View also asks for reimbursement of its costs.

The State also appeals the fee award but contends that it was too high. According to the State, the trial court should have awarded fees based only on a "lodestar" method, which basically is tied to the number of hours attorneys have worked on a case, with the potential for a "multiplier" for contingent and novel litigation. The State advocates a fee based on the total hours worked at an hourly rate of $150 an hour with no multiplier.

In *Lake View II*, this court held that "an economic benefit did accrue to the State of Arkansas due to Lake View's efforts and attorneys' fees should be awarded." 340 Ark. at 497, 10 S.W.3d at 902. However, we did not hold what that economic benefit was. We noted that "this is a unique case with a unique set of circumstances," and we held that under these exceptional facts, the State had waived its right to sovereign immunity. *Id.* We stated that we were "not sanctioning attorneys' fees in all public-interest litigation or endorsing a new exception to the American Rule." *Id.* In remanding this issue to the trial court, we refused to make a pronouncement on how the fees should be paid, stating that this was a task for the trial court to undertake. *See id.* We mentioned both a percentage fee based on economic benefit or the lodestar approach

based on hours worked as possible methods for awarding attorneys' fees. *See id.*

On remand, the trial court ultimately awarded attorneys' fees to Lake View counsel in the amount of $9,338,035.00. In making its award the trial court used a $130 million economic benefit, which it stated the parties had agreed to, as the starting point for calculating fees. The court next examined whether a percentage of that economic benefit or "some other approach" was appropriate in this case. The court noted: "One purpose of the percentage method is to encourage early settlement by not penalizing efficient counsel and ensuring that competent counsel continue to be willing to undertake risky, complex, and novel litigation." The court observed that this litigation had been "long and arduous" and that the issues involved were novel and difficult. The court further observed that the Lake View counsel were placed "at a very high risk because of the time and effort involved and the uncertainty of success. . . ." The court pointed to the 1995 and 1997 legislation as well as Amendment 74 and "a common fund of $130,000,000" as the results of the attorneys' efforts.

The trial court then cited other common–fund cases where a percentage of the fund had been awarded as attorneys' fees. The cases cited were all class–action cases involving either a business or municipal corporation, or an illegal-exaction issue. The trial court stated that Lake View counsel requested a fee of twenty-five percent of the "common fund" and that expert witnesses had testified that contingent fees "are normally 33 1/3% and even 40% in extremely difficult cases."

Based on the expert witnesses, affidavits, the contingent nature of the case, and the factors for awarding attorneys' fees set out in *Chrisco v. Sun Indus., Inc.*, 304 Ark. 227, 800 S.W.2d 717 (1990), the trial court awarded the following attorneys' fees:

Liability Phase: period prior to February 1998:

award: $8,500,000.00.

calculation: 6.5% of $130,000,000.00, or, alternatively,
 15,000 hours (supported by Lake View affidavit)
 x $150.00 per hour (supported by expert testi-

mony of two attorneys) x
3.877 (multiplier court stated was reasonable based upon length of litigation, difficulty, and contingent nature of success).

February, 1998—June 18, 2000

award: $525,000.

calculation: attorneys estimated 4500-5500 hours of work and requested no particular rate. The court reduced the hours to 3500 and used the $150 per hour rate.

June 19, 2000—November 1, 2000

Attorneys kept contemporaneous work records for this period, per the trial court's order.

award: $313,035.

calculation: 2,086.90 hours x $150 per hour.

Total Award: $9,338,035

At the outset, we must admit to some concern about the lack of time records for the number of hours claimed to have been worked in this case for the liability phase. The trial court found, however, that no one disputed the 15,000 hours claimed, and Lake View attested to the total hours by affidavit. The State, in its brief on appeal, merely questions the total hours worked in a footnote. Accordingly, we will accept 15,000 as the hours worked in the liability phase, as found by the trial court.

We disagree with Lake View, however, in two respects. It is virtually impossible to fix precisely what the economic benefit to the state has been as a result of counsels' efforts. To be sure, there has been an economic benefit to the State, as this court acknowledged in *Lake View II*. But just what that exact benefit might be is fodder for speculation. $130 million was simply the amount agreed to by opposing counsel in an effort to settle the case and to decide upon appropriate attorneys' fees for Lake View counsel.

Our second disagreement concerns the propriety of arguing caselaw involving fees awarded in class-action lawsuits involving a corporation or an illegal-exaction issue as precedent for a fee award in a school-funding case, where taxpayer money will be

used to pay those fees. The two situations do not appear to be remotely comparable. Indeed, counsel for Lake View at oral argument was unable to cite this court to a single school-funding case where a percentage fee based on an economic-benefit theory had been awarded. In the one school-funding case in recent years where a state supreme court affirmed an attorneys' fee to successful counsel, the lodestar method was employed and not a percentage fee. *See Claremont Sch. Dist. v. Governor*, 144 N.H. 590, 761 A.2d 389 (1999).

█ The trial court used the *Chrisco* factors for guidance in assessing attorneys' fees. *See Chrisco v. Sun Indus., Inc., supra.* Those factors are (1) the experience and ability of counsel; (2) the time and labor required to perform the legal service properly; (3) the amount involved in the case and the results obtained; (4) the novelty and difficulty of the issues involved; (5) the fee customarily charged in the locality for similar services; (6) whether the fee is fixed or contingent; (7) the time limitations imposed upon the client or by the circumstances; and (8) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer. *See id.* This court recognized, in *Chrisco*, the superior perspective of the trial judge in weighing the applicable factors, and we concluded that we would not set aside a trial court's fee award absent an abuse of discretion.

It is obvious to this court in the case at hand that the trial court used most of the *Chrisco* factors in making his award. But in his analysis, he looked to both a percentage fee based on six-and-one-half percent of $130 million and hours worked at a rate of $150 an hour, plus a multiplier. Thus, the initial award of $8,500,000 for the liability phase of the litigation was based, alternatively, on a percentage calculation and also on hours worked, with a 3.778 multiplier based on the length, difficulty, risk, and importance of the case.

█ Because the economic benefit in this case does not lend itself to a firm figure and because the fee award must be paid by the government, either state or local, from tax revenues, we reject a percentage fee in this case. Furthermore, this court has

never expressly adopted a multiplier against hours worked as a means for arriving at appropriate fees. We will not do so in this case.

To reiterate what we said in *Lake View II*, this is a unique case with a unique set of circumstances, where there is no question but that the state and local school districts derived an economic benefit. Ordinarily, there could be no fee award assessed against the State due to the doctrine of sovereign immunity under our state constitution. It is only because the State waived sovereign immunity in this case that the issue of an attorneys' award became viable.

 We conclude that attorney's fees based on hours worked at an hourly rate of $150 is appropriate in this case. The novelty and difficulty of this case, the results obtained, the hours worked, the expertise of counsel, and the effect on other legal work of counsel, all militate in favor of an attorney's fee, as we previously held in *Lake View II*. Nevertheless, for reasons already stated, we cannot justify an award based on a percentage applied against $130 million or the use of a multiplier to enhance the fee. We hold that, in so doing, the trial court abused its discretion.

 We modify the trial court's fee award to a total fee of $3,088,035, which is based on total hours worked, 20,587 hours, multiplied by the hourly rate of $150 per hour. We further modify the trial court's order and award costs in the amount of $309,000, which amount was supported by a Lake View affidavit. The total award of attorneys' fees and costs, as modified, is $3,397,035.

## IX. Stay

Because we hold that the current school-funding system is unconstitutional, our schools are now operating under a constitutional infirmity. Other supreme courts facing this dilemma have either remanded the matter to the trial courts or stayed the court's mandate in order to give the General Assembly and Executive Branch an opportunity to cure the deficiencies. *See, e.g., Claremont Sch. Dist. v. Governor*, 142 N.H. 462, 703 A.2d 1353 (1997) (staying all further proceedings until the end of the upcoming leg-

islative session and maintaining present funding system through the 1998 tax year); *DeRolph v. State*, 78 Ohio St. 3d 193, 677 N.E.2d 733 (1997) (staying the effect of the decision for twelve months and remanding to the trial court for entry of judgment and retention of jurisdiction until legislation is enacted and in effect for action as may be necessary in conformity with opinion); *Brigham v. State*, 166 Vt. 246, 692 A.2d 384 (1997) (entering default judgment for students and school districts and remanding so that jurisdiction could be retained until valid legislation enacted and in effect, and for any further proceedings); *Roosevelt Elementary Sch. Dist. No. 66 v. Bishop*, 179 Ariz. 233, 877 P.2d 806 (1994) (reversing and remanding the case to the trial court for entry of judgment and retention of jurisdiction to determine within a reasonable time whether legislative action had been taken); *Edgewood Ind. Sch. Dist. v. Kirby*, 804 S.W.2d 491 (Tex. 1991) (staying the effect of the Supreme Court's previously-ordered injunction until April 1, 1991); *Rose v. Council for Better Educ.*, 790 S.W.2d 186 (Ky. 1989) (withholding the finality of the decision until 90 days after the adjournment of the General Assembly).

 Clearly, the public schools of this state cannot operate under this constitutional cloud. Were we not to stay our mandate in this case, every dollar spent on public education in Arkansas would be constitutionally suspect. That would be an untenable situation and would have the potential for throwing the entire operation of our public schools into chaos. We are strongly of the belief that the General Assembly and Department of Education should have time to correct this constitutional disability in public school funding and time to chart a new course for public education in this state. Accordingly, we stay the issuance of our mandate in this case until January 1, 2004. This will give the General Assembly an opportunity to meet in General Session and the Department of Education time to implement appropriate changes. On January 1, 2004, the stay will terminate, and this case will be over. Any subsequent challenge will constitute separate litigation.

## X. Conclusion

We emphasize, once more, the dire need for changing the school-funding system forthwith to bring it into constitutional

compliance. No longer can the State operate on a "hands off" basis regarding how state money is spent in local school districts and what the effect of that spending is. Nor can the State continue to leave adequacy and equality considerations regarding school expenditures solely to local decision-making. This court admits to considerable frustration on this score, since we had made our position about the State's role in education perfectly clear in the *DuPree* case. It is not this court's intention to monitor or superintend the public schools of this state. Nevertheless, should constitutional dictates not be followed, as interpreted by this court, we will have no hesitancy in reviewing the constitutionality of the state's school-funding system once again in an appropriate case.

CORBIN and HANNAH, JJ., concur.

GLAZE, J., concurs in part and dissents in part.

IMBER, J., not participating.

Special Justice CAROL DALBY joins.

DONALD L. CORBIN, Justice, concurring. I concur in the resolution of this case as reflected in the majority's opinion. I write separately, however, to voice my concern over the personal tenor of this lawsuit as reflected in the briefs and motions filed by the attorneys for Lake View. During the course of this appeal, many motions, most of which were purely procedural, were filed by both the State and Lake View. In at least two of their pleadings, Lake View's attorneys raised the specter of racism. In short, they asserted that they were being treated unfairly by the State and this court on the basis of the color of their skin.

In one of those pleadings, Lake View's attorneys compared their plight to that of the African-Americans in the landmark cases of *Dred Scott v. Sandford*, 60 U.S. 393 (1856), *Plessy v. Ferguson*, 163 U.S. 537 (1896), and *Brown v. Board of Education*, 347 U.S. 483 (1954). Such allegations of racial discrimination are certainly very serious and should not be made lightly. However, from my view of the case, they are completely unfounded and without factual support. As such, the behavior of these attorneys, in my opinion, is reprehensible.

If this were not bad enough, Lake View's attorneys continued this theme of racial discrimination in their brief on the issue of attorney's fees. There, they stated in no uncertain terms that they had been given such a small attorney's fees, over $9 million, because they were African-American. They further stated that had they been Caucasian, they would have received a much bigger sum. They wrote:

> The vast differentiation in the fees that has been allowed in this cause is glaring in that the appellant's attorneys are the only African-American team of attorneys who have appeared before this court in a public interest case and are now receiving a disparaging fee. The members of the court must take care to recognize the implications of the 14th Amendment of the United States Constitution and Article 2, Sections 2, 3 and 18 of the Arkansas Constitution require that appellant's attorneys enjoy the same constitutional rights as do Caucasian attorneys in similar situation.

As with the motions, Lake View's attorneys offered nothing in the way of proof to support their claim that they were discriminated against in being awarded a paltry $9,338,035.00. Indeed, it is difficult to imagine that any such proof exists, as the chancellor's order demonstrates that he held these attorneys in high esteem. Furthermore, the cases on which Lake View's attorneys rely, where Caucasian attorneys allegedly received large sums of money, are not school-funding cases. Counsel for Lake View's attorneys admitted in oral argument that he had not found any school-funding case where a percentage fee was awarded.

In sum, these unfounded allegations of racism are reckless and disrespectful, both to this court and to the lower court. They are an unwanted distraction from the real issues in this case. The issue of race simply did not enter into this court's decision. Indeed, I am completely confident in saying that the skin color of Lake View's attorneys played no part whatsoever in this court's decision. I am equally confident that it played no part in any of the lower court proceedings.

I understand that there was a certain amount of posturing going on in this case, both by the State's and Lake View's attorneys, and that this case was a high-profile media event. Be that as

it may, unfounded and unsupported allegations of racism have no business in a lawsuit of this nature.

JIM HANNAH, Justice, concurring. I concur with the majority that the current public school system fails to meet the standards for the public schools required under our constitution. I write separately to set out why I reach the same conclusion and to clarify that the role of this court is to determine whether our public school system meets our constitutional standards. The role of this court is not to direct the General Assembly in what must be done to provide the required public school system. Under our constitution, the General Assembly bears the duty to provide a public school system that complies with our constitution.

The issues presented in this case include whether the current funding system is adequate and whether it is equitable. These two issues may be considered simply as a question of whether the current school system provided by the General Assembly meets the constitutional requirements of a "general, suitable, and efficient system of free public schools. . . ." Ark. Const. art. 14, § 1. It does not.

The Constitution of the State of Arkansas provides that the State must maintain a general, suitable, and efficient system of free public schools. Ark. Const. art. 14, § 1. The obligation to provide the required system of public schools belongs to the General Assembly. The Arkansas Constitution vests in the General Assembly the duty and authority to establish, maintain, and support a public school system. *Barker v. Frank*, 327 Ark. 589, 939 S.W.2d 837 (1997); *E. Poinsett County Sch. Dist. No. 14 v. Massey*, 315 Ark. 163, 866 S.W.2d 369 (1993); *Saline County Educ. Bd. v. Hot Springs Educ. Bd.*, 270 Ark. 136, 603 S.W.2d 413 (1980). *See also*, *Lemaire v. Henderson*, 174 Ark. 936, 298 S.W. 327 (1927). In *Wheelis v. Franks*, 189 Ark. 373, 72 S.W.2d 231 (1934), this court stated:

> It has been too often held, as now to be a matter of debate, that the Legislature is clothed by the Constitution with plenary power over the management and operation of the public schools. It is for the Legislature to declare policy with reference to the schools,

and however much this court might doubt the wisdom of the policy declared, it has no power to alter it.

*Wheelis*, 189 Ark. at 376. That the General Assembly has plenary power over the public schools means that it has full power. *Beard v. Albritton*, 182 Ark. 538, 31 S.W.2d 959 (1930). The responsibility for the creation, organization, and regulation of that system of public schools thus is within the exclusive province of the General Assembly. *Wallace Sch. Dist. v. County Bd. of Educ.*, 214 Ark. 436, 439, 216 S.W.2d 790 (1949). Supervision of the public schools is vested in such officers as the General Assembly may provide. Ark. Const. art. 14, § 4.

The role of this court is not to dictate policy; rather, it is to interpret the constitution. As this court stated in *City of Hot Springs v. Creviston*, 288 Ark. 286, 705 S.W.2d 415 (1986):

> Ever since *Marbury v. Madison*, 1 Cranch 137, was decided in 1803, the Supreme Court has had the responsibility of interpreting the United States Constitution and the state courts that of interpreting the state constitutions. But the judicial authority does not extend beyond interpretation. The courts do not have the power to hold a constitutional mandate in abeyance; they should not have that power. The constitutional way of doing things may be slow at times, but it is the right way.

*Creviston*, 288 Ark. at 293.
Thus, there is no question that this court has the obligation and authority to interpret the constitutional provisions regarding schools and determine whether the General Assembly is fulfilling its constitutional duty to provide a general, suitable, and efficient system of free public schools.

Previous case law confirms this conclusion regarding our duty to interpret the constitution. In the years since the present constitution was adopted, this court has had occasion to interpret provisions of Article 14 of our constitution on many occasions. As already noted, this court has declared that the General Assembly is obligated under the constitution to establish and maintain the public schools. *Wallace, supra.* This court has also declared that the General Assembly has the obligation to create schools and set the boundaries of districts. *Beard, supra.* The authority to decide how

the state is to be divided up in public schools lies with the General Assembly and is "supreme." *Massey*, 315 Ark. at 169. *See also*, *Krause v. Thompson*, 138 Ark. 571, 211 S.W.2d 925 (1919). The issue of funding of school districts has also been before this court on a number of occasions as it relates to the General Assembly's duty to provide a general, suitable, and efficient school system under the constitution. *Dupree v. Alma Sch. Dist. No. 30*, 279 Ark. 340, 651 S.W.2d 90 (1983); *see also, Krause, supra*.

This court has not specifically defined the terms "general, suitable, and efficient." The word "general" in Article 14, Section 1, means that the public schools required under the constitution must be of common benefit to those who are to be served by the schools, i.e., those who are between six and twenty-one years of age.[1] The public schools must offer "gratuitous instruction of all persons between the ages of six and twenty-one. . . ." *Special Sch. Dist. No. 65 v. Bangs*, 144 Ark. 34, 36, 221 S.W. 1060 (1920). In 1885, this court stated: "It is the clear intention of the constitution and the statutes alike, to place the means of education within the reach of every youth." *Maddox v. Neal*, 45 Ark. 121, 124 (1885). "Education at the public expense has thus become a legal right." *Id.* Under our constitution, educational opportunity may not be "controlled by the fortuitous circumstances of residence." *Dupree*, 279 Ark. at 345. Thus, "general" means a "suitable" education must be afforded to all between the ages of six and twenty-one.

The word "suitable" may also be understood by reference to earlier decisions of this court. In *Fort Smith School District v. Maury*, 53 Ark. 471, 14 S.W. 669 (1890), this court stated:

> The duty to establish and keep in operation schools is not met by the employment of teachers and keeping them at the school house; but it demands that suitable persons shall be kept as teachers, and a school maintained adapted to the intellectual and moral advancement of pupils.

---

[1] As the majority notes, whether early childhood education is to be provided is a public policy issue for the General Assembly to resolve. It is not required under the constitution.

*Maury*, 53 Ark. at 473. *See also, Berry v. Arnold Sch. Dist.*, 199 Ark. 1118, 1124, 137 S.W.2d 256 (1940). This court has also stated that there should be a constant effort to raise the standards of the public schools and the General Assembly has the power to adapt our schools to the most advanced standards in order to give our youth the best education obtainable on all subjects. *Dickinson*, 120 Ark. at 88. In *Maury, supra*, this court went on to note that the duty to establish and keep schools in operation necessarily included the duty of agencies set up by the General Assembly to visit the schools, noting, and then correcting poor instruction and lack of progress. *Maury*, 53 Ark. at 473-74.

The discussion in *Maury, supra, Berry, supra*, and *Dickinson, supra*, also casts light on the meaning of "efficient." A system must be provided by the General Assembly that is capable of effectively fulfilling the constitutional mandate for a general and suitable system of public schools. The word "efficient" is defined as "Making, causing . . . Effective in producing the desired result with minimum wasted effort." *The New Shorter Oxford English Dictionary* 787 (Edition 1993). It appears doubtful to me that the framers of our constitution had a definition of "efficient" in mind similar to that set out in *Rose v. Council for Better Education, Inc.*, 790 S.W.2d 186 (Ky. 1989). As noted in the majority opinion, the definition in *Rose* was relied upon by both Judge Kilgore and Judge Imber. In *Rose*, the Kentucky Supreme Court defined an efficient education in terms of educational subject matter and level of proficiency to be obtained. As the majority goes on to note, the General Assembly may have been influenced by the definition in *Rose* when Acts 1108 and 1307 of 1997 were adopted. However, whatever the definition of efficient might be, the adoption of such specific methods and goals in public education as discussed in *Rose, supra*, is a matter of policy left by our constitution to the General Assembly. *See Wheelis, supra*. Our duty is to determine whether the public schools as presently functioning meet the constitutional requirements of a "general, suitable, and efficient system of free public schools." Ark. Const. art. 14, § 1.

Although the terms "General, suitable, and efficient" might be more finitely defined, under the facts of this case, further definition is not necessary. The meaning of the words general, suita-

ble and efficient that may be derived from our case law is more than sufficient to use in determining whether the constitutional mandate has been met by the General Assembly.

I also note that under the facts of this case, we need not determine whether judicial review is under strict scrutiny or whether there is a fundamental right to the constitutionally mandated general, suitable, and efficient education. In 1885, this court held plainly that every child entitled to a public education has a right to a general, suitable, and efficient education in the public schools. *Maddox, supra.* Under any conceivable standard of review, the current system is woefully inadequate and does not begin to fulfill the constitutional mandate.

The majority opinion sets out the facts, and I will not repeat them here. The examples provided hardly scratch the surface of the inadequacies of the current public school system. Large numbers of our students test below the national average. A majority of Arkansas students require remediation in math or English when they start college. Our classroom teachers are substantially underpaid. Compensation of teachers is not even consistent between districts.

To see the gravity of the problem, we need look no further than to a district where the entire math program in one school is offered by a grossly underpaid substitute teacher who is neither provided with sufficient supplies, materials, or computers, nor adequate physical facilities. We also need look no further than to a district where students are not afforded reasonable toilet facilities, where roofs leak, where buses do not meet minimum state standards, and where there are buildings without heat. It is the obligation of the General Assembly to provide the constitutionally required facilities, materials, equipment and competent teachers. *Maury, supra; Berry, supra.*

The constitution places the responsibility squarely upon the General Assembly to establish, maintain, and support a public school system which provides a general, suitable, and efficient educational opportunity to all students between the ages of six and twenty-one. *See* footnote 1. Since the adoption of the present constitution in 1874, school districts have been created, and

responsibility for taxation for schools has in part been transferred to the local level. Local districts have run their schools, and the public is accustomed to local control. However, none of this alters the General Assembly's responsibility under our constitution.

The General Assembly has been well within its constitutional authority in the creation of the districts and in allowing local control. This court has long recognized that the General Assembly must employ agencies to accomplish the obligation of establishing and maintaining a system of free public schools. *Lemaire*, 174 Ark. at 939. *See also, Allen v. Harmony Grove Consol. Sch. Dist. No. 19*, 175 Ark. 212, 298 S.W.2d 997 (1927). The State may establish boards and appoint directors, but such boards and directors are only agents of the General Assembly. *Maddox, supra.* Boards and directors are but trustees appointed to run the system the constitution requires. *Id., see also, Allen, supra.* If the system does not function properly, the General Assembly bears responsibility whatever the cause. *See Dupree, supra.*

The majority notes the frustration that the Arkansas Department of Education has failed to complete an adequacy study requested by the General Assembly. The trial court stated that to determine the amount of funding "for an education system based on need and not on the amount available but on the amount necessary to provide an adequate educational system, the court concludes an adequacy study is necessary and must be conducted forthwith." This is a failure of the General Assembly. The Department of Education, in this context, is acting as an agent of the General Assembly.[2] The Department's inaction is a matter for the General Assembly to resolve. *Wheelis, supra.* It is the General Assembly's duty under the constitution to provide the required

---

[2] The Department of Education is not created or established by the constitution. It was created by the General Assembly. *See* Act 169 of 1931. Supervision of the public schools is vested ultimately in the General Assembly. *Barker, supra;* Ark. Const. art. 14, § 4. A State Board of Education constituting the State Department of Education was created by the General Assembly in Act 169 of 1931. In 1931, under Act 169, members of the Board were elected. In Act 244 of 1937, the General Assembly directed that the board members be appointed by the Governor. While the General Assembly has allowed the Executive Department to appoint members of the State School Board, the duty to supervise the public school system remains with the General Assembly.

public school system. It is up to the General Assembly to do whatever it must do with respect to boards, districts, or bureaucracies to make the system meet the constitutional requirements.

The General Assembly is free to decide how to establish and maintain a system of public schools that meet the constitutional mandate. *Barker, supra.* The current public school system does not meet constitutional requirements. The General Assembly must now act. We do not have the power to hold a constitutional mandate in abeyance. *Hutton v. Savage,* 298 Ark. 256, 769 S.W.2d 394 (1989); *Creviston, supra.*

I also note that, as the majority discusses, the issues raised in this case include whether the current funding system is adequate and whether it is equitable. These two issues are inexorably connected and what is actually at issue before this court is simply whether the current school system provided by the General Assembly meets the constitutional requirements of a "general, suitable, and efficient system of free public schools. . . ." Ark. Const. art. 14, § 1. Funding plays a role, in determining whether a general, suitable, and efficient system of public schools is being provided. In *Dickinson v. Edmondson,* 120 Ark. 80, 178 S.W. 390 (1915), this court stated: "The Legislature has no authority to select an arbitrary basis for the disbursement of funds. . . ." *Dickinson,* 120 Ark. at 90.

The issue in this case is more complex than a mere funding issue. The majority cites *Dupree,* in its discussion of funding quotes the *Dupree* opinion where this court stated that, "[f]or some districts to supply the barest necessities and others to have programs generously endowed does not meet the requirements of the constitution. Bare and minimal sufficiency does not translate into equal educational opportunity." *Dupree,* 279 Ark. at 93. This statement by the court in *Dupree* in 1983 may also be interpreted as stating simply that bare and minimal sufficiency does not satisfy the requirements of a suitable public school system.

I agree that in practical terms it is highly doubtful that meaningful reform will ever be achieved by the General Assembly

unless it determines actual expenditures per pupil and makes necessary decisions on funding. That is something the General Assembly must deal with. The funding required does relate to the constitutional requirement for education, and the General Assembly must address it. The issue of wealth of districts is less helpful. Whether there is classification based on wealth exists begs the real issue. The wealth of a district with respect to a general, suitable, and efficient public school is not relevant because the state must assure the required educational opportunities are provided regardless of wealth.

Looking for inadequacy and inequality in funding does not necessarily answer the real issue. The real issue is whether each child is provided the constitutionally required educational opportunities. *Maddox, supra.* The real issue is whether all students are afforded the constitutionally required education.

Amendment 74 must also be noted in this discussion, because it specifically provides that school districts may "to the extent permissible" raise additional funds to "enhance the educational system in the school district." Ark. Const. amend. 74. "Enhance" means the educational opportunities that are being provided by the additional funding are above and beyond the general, suitable, and efficient education required under the constitution. Therefore, inequality between districts may well constitutionally exist. It may not, however, exist as to provision of the constitutionally required "general, suitable, and efficient" public schools. In short, while I agree that the present system is unconstitutional, I cannot agree that the General Assembly is bound to assure that each student must receive precisely the same educational opportunities, facilities, curricula, or equipment. Amendment 74 will not allow this conclusion. Perhaps that is why the majority opinion speaks in terms of substantially equal educational opportunity, rather than precisely the same.

I also write to state that while I agree that under *Lake View II*, attorneys' fees will be awarded in this case, I do not agree that fees should be granted based upon acquiescence by the State regarding work done by the attorneys. Documentation of work

done by the attorneys and costs incurred is woefully inadequate. There is a lack of records of attorney activity until 1998. For the existing billings between 1998 and 2000 there are days when the billings are quite unclear. The records also imply that, for at least three years, there was little, if any, activity at all. That would mean that over the years there was activity the attorneys were billing in excess of two thousand hours per year.

The use of school funds for other than their intended purpose is specifically limited by the Arkansas Constitution. Ark. Const. art. 14. *See also, Special Sch. Dist. of Ft. Smith v. Sebastian County*, 277 Ark. 326, 641 S.W.2d 702 (1982). If fees and costs are to be awarded in a case involving constitutionally protected funds, then, at the very least, supporting documentation should be required.

TOM GLAZE, Justice, concurring in part and dissenting in part. I write first to repeat my earlier dissent that this case should have ended when (1) then Chancellor Imber entered her orders in 1994, (2) this court dismissed the appeal from those orders, and (3) the Lake View School District failed to cross-appeal from the chancellor's orders. *See Lake View School District No. 25 v. Huckabee*, 340 Ark. 481, 10 S.W.3d 892 (2000) (Glaze, J. dissenting) (majority opinion now refers to as Lake View II). In *Lake View II*, my opinion was (and still is) that the chancellor erred when she stayed her 1994 orders for two years, and, if Lake View had appealed those orders, it would have been entitled to the injunctive relief it sought. As far as the acts the General Assembly enacted after 1994 in its effort to comply with the chancellor's decisions, Lake View and any other school district had the opportunity to challenge the validity of those acts in another suit. Clearly, those acts involved new and different issues to be argued and decided.

Instead, our court adopted a new review procedure and has provided for "compliance trials" in order to consider the constitutionality of any laws enacted since Chancellor Imber's 1994 orders. This court's action in this respect was well intentioned to provide a helpful hand in its attempt to rectify serious issues sur-

rounding the funding problems facing our state's schools. These issues, however, could have been appropriately dealt with if this court had required the parties to follow this court's existing rules of procedure, appellate rules, and its case law interpreting those rules. I discussed this subject in my earlier dissent, and there is no need to rehash that dissenting opinion here, except to say that when this court strays from its established rules and laws to create new remedies to resolve hard and controversial issues, it invariably makes matters worse. *See, e.g., Republican Party of Arkansas v. Kilgore*, 350 Ark. 540, 98 S.W.3d 798 (Glaze, Corbin, and Imber, JJ., dissenting).

Because of this court's unusual decision to allow the chancellor's 1994 order to be held in abeyance for two years, matters changed afterwards — Arkansas voters approved Amendment 74, and the General Assembly enacted acts bearing on the state's school funding problems and raising new issues. Because this court did not correctly conclude the litigation over which Chancellor Imber presided, our court now is confronted with the question of which findings and decision it is to review, since new laws have surfaced after the 1994 orders, and a new judge, Collins Kilgore, has been assigned to decide the Lake View case. This issue as to what this court should review is most perplexing, and, once again, would not have existed if our court had ended its review of Judge Imber's 1994 orders, by denoting those orders final and deciding the issues in that appeal. Alas, the court's failure to do so now forces this court to choose whether it should review Judge Imber's or Judge Kilgore's orders. The majority court has decided Judge Kilgore's findings and order are now the ones before this court. The majority court submits that Judge Imber's case has officially ended, and Judge Kilgore's order springs forth for review, even though ordinarily any final order brought on appeal brings up for review any intermediate order involving the merits. *See* Ark. R. App. P.—Civ. 2(b).

While I thoroughly disagree with the new and unusual manner in which this court has taken jurisdiction of this case on appeal, I recognize I am outnumbered. However, I am hopeful

that sometime in the near future this court will revert to its rules and require trial courts to decide constitutional questions and not allow those courts to hold their decisions in abeyance, thus requiring later "compliance hearings." We have rules and remedies, as well as legislative options, to enforce such constitutional mandates, and our court need not create new ones.

Regarding the merits of this case, I largely agree with the majority court. For example, the majority, I believe, correctly holds that courts have the authority to decide the constitutionality of the State's school funding system. Our court essentially decided that question in the case of *DuPree v. Alma School Dist. No. 30*, 279 Ark. 340, 651 S.W.2d 90 (1983). I also am of the view that the lower court's decisions, and our court's decision on appeal, are correct in ruling that the State's school-funding system is unconstitutional and inadequate under Article 14 of the Arkansas Constitution. While the argument is strong that this court should proclaim an adequate education to be a fundamental right, such a proclamation would add very little to the opinion, since the majority opinion clearly recognizes and mandates that the State has an *absolute duty* under our constitution to provide an adequate education to each school child.

Finally, I also agree with the majority decision regarding the award of attorneys' fees, only because the State waived sovereign immunity in this case. Otherwise, Lake View would not be entitled to any attorneys' fees since attorneys' fees are authorized in only two situations: (1) when fees are provided by statute (commonly labeled the "American Rule"), and (2) in illegal-exaction cases where a class action is sought and a common fund is established. *See Cotten v. Fooks*, 346 Ark. 130, 55 S.W.3d 290 (2001) (Glaze and Hannah, JJ., concurring) (where court refused to award fees because there was no common fund from which such fees could be paid); *but see Lake View School Dist. No. 25 v. Huckabee*, 340 Ark. 481, 10 S.W.3d 892 (2000) (Glaze, J., dissenting).

Here, no refund exists, but the State affirmatively recognized that Lake View's counsel were entitled to attorneys' fees, even though no statute provides for them. In these limited circum-

stances where the State waived its immunity, the majority court was correct in awarding fees, and, in doing so, utilizing the established factors set out in *Chrisco v. Sun Indus., Inc.*, 304 Ark. 227, 800 S.W.2d 717 (1990).

In conclusion, I must disagree with the majority opinion where it stays the issuance of the court's mandate until January 1, 2004, so as to give the General Assembly and the Department of Education time to implement appropriate changes. The opinion further reads that "[W]ere we not to stay our mandate in this case, every dollar spent on public education in Arkansas would be constitutionally suspect." The majority court tends to raise alarm where none exists, nor is argued.

Our established appellate rules provide that in all cases, civil and criminal, the clerk will issue a mandate when the court's decision becomes final. *See* Ark. Sup. Ct. R. 5-3(a). Rule 5-3(c) provides for a stay only where parties seek to prosecute proceedings to the Supreme Court of the United States.

In short, this court should follow its own rules. The General Assembly meets beginning in January of 2003, and I have every confidence that governmental body, the governor, and the executive branch will work towards assuring the citizens a school system that will meet constitutional muster. Part of the delay in obtaining a decision in this case has been due to this court staying its orders. This court should let the judicial, legislative, and executive systems move ahead as it usually does in these matters, and Arkansas can put this constitutional issue behind it. Accordingly, I join in the majority decision to affirm in part and reverse in part, but do not join in staying this court's decision until January 1, 2004.