The Honorable Randy Laverty State Senator P.O. Box 165 Jasper, AR 72641
Dear Senator Laverty:
I am writing in response to your request for my opinion on the following questions:
 1. The Arkansas Supreme Court in its Opinion No. 01-836 in the Lake View case found Arkansas Code Annotated 26-80-204(18)(C) unconstitutional. What is the effect of this ruling on the state's school districts?
 2. Will those school districts that are not currently voting the required twenty-five (25) mills for maintenance and operations (MO) be required to submit a proposed millage increase to their patrons at the September school board elections in order to reach the required millage level? Can this question be submitted to the patrons of a school district at a special election?
 3. What are the consequences for the failure of a school district to submit a millage increase for consideration by their patrons at either a special election or the September school board election? What are the consequences to the school district if the patrons of the school district fail to approve such a millage request?
 4. Can the General Assembly pass legislation that would extend the time frame for school districts to submit proposed millage increases to their patrons for consideration to meet the requirements of the Arkansas Supreme Court's Lake View opinion? If not, why not?
RESPONSE
With respect to your first question, because the court found A.C.A. § 26-80-204(18)(C) unconstitutional, school districts can no longer credit excess debt service millages against the 25-mill property tax that Amendment 74 obligates them to devote to maintenance and operation of the schools. With respect to your second question, A.C.A. § 6-14-114(4)(D) requires a vote by school district electors at the regularly scheduled annual election on "[t]he total millage rate levied for all purposes in the school district" — a figure that includes the uniform rate of tax. The answer to your question is consequently "yes": school districts will be obligated to submit for a vote the necessary millage to meet the uniform rate of tax as interpreted by the Arkansas Supreme Court. However, the uniform rate of tax is constitutionally mandated by Amendment 74, and the quorum court is consequently obligated to levy the tax regardless of the result of the vote. With respect to the second part of your second question, A.C.A. § 6-14-102(d) authorizes special school elections for the purposes of presenting debt service issues to the electorate and to levy additional mills over and above the uniform rate of tax. My inquiries reveal that in the wake of the Lake View opinion, various school districts have in fact scheduled special elections to consider debt restructuring in order to lower their total millages. I believe conducting such special elections is fully consistent with current law. With respect to your third question, under Amendment 74 the quorum court has no choice but to levy the uniform rate of tax. Consequently, regardless of whether the issue is put to the voters, the quorum court in November must levy the constitutionally required 25-mill uniform rate of tax. This conclusion would apply even if district voters expressed disapproval of the uniform rate of tax. With respect to your fourth question, I believe Amendment 74 precludes the General Assembly from enacting any legislation that would defer the annual levy of the 25-mill tax.
Question 1: The Arkansas Supreme Court in its Opinion No. 01-836 in theLake View case found Arkansas Code Annotated 26-80-204(18)(C)unconstitutional. What is the effect of this ruling on the state's schooldistricts?
Amendment 74 of the Arkansas Constitution provides in pertinent part:
 (b)(1) There is established a uniform rate of ad valorem property tax of twenty-five (25) mills to be levied on the assessed value of all taxable real, personal, and utility property in the state to be used solely for maintenance and operation of the schools.
 (2) Except as provided in this subsection the uniform rate of tax shall not be an additional levy for maintenance and operation of the schools but shall replace a portion of the existing rate of tax levied by each school district available for maintenance and operation of schools in the school district. The rate of tax available for maintenance and operation levied by each school district on the effective date of this amendment shall be reduced to reflect the levy of the uniform rate of tax. If the rate of tax available for maintenance and operation levied by a school district on the effective date of this amendment exceeds the uniform rate of tax, the excess rate of tax shall continue to be levied by the school district until changed as provided in subsection (c)(1). If the rate of tax available for maintenance and operation levied by a school district on the effective date of this amendment is less than the uniform rate of tax, the uniform rate of tax shall nevertheless be levied in the district.
The legislation enabling the above constitutional provisions is Acts, 1997, No. 1300, § 3, codified at A.C.A. § 26-80-204(18) (Supp. 2001), which provides:
 "Uniform rate of tax" means a uniform rate of ad valorem property tax of twenty-five (25) mills to be levied on the assessed value of all taxable real, personal, and utility property in the state to be used solely for maintenance and operation of the schools. In calculating the uniform rate of tax imposed by Arkansas Constitution, Article 14, § 3, as amended by Arkansas Constitution, Amendments 11, 40, and 74, the following categories of millage may be utilized to meet the minimum millage requirement:
(A) The local school district's maintenance and operation millage;
(B) The dedicated maintenance and operation millage;
(C) Excess debt service millage;[1] and
 (D) The millage derived from the ratio of the debt service funding supplements divided by the total assessment.[2]
As acknowledged in your request, in subsection VIII(d) of its opinion,Lake View School District No. 25 v. Huckabee, 351 Ark. 31, 86-89, ___ S.W.3d ___ (2002), the supreme court reversed the trial court's conclusion that A.C.A. § 26-80-204(18)(C) is constitutional. The court began its discussion by defining the issue as being whether the statute permissibly "authorized school districts to subtract excess debt millages against the uniform tax of 25 mills owed to the State under Amendment 74." Id. at 86. The court further remarked:
 If a school district already has in effect millages for maintenance and operation, those millages may be counted against the uniform rate of 25 mills required by Amendment 74. Nowhere, however, does Amendment 74 provide that part of a millage adopted by the school district for an entirely different purpose may be subtracted from the 25 mills owed. The General Assembly's legislation permitting excess debt service millage is clearly contrary to the plain meaning of Amendment 74.
Id. at 89. The court concluded: "We hold that Ark. Code Ann. § 26-80-204(18)(C) violates Amendment 74 of the Arkansas Constitution and is void and of no effect." Id.
Based solely on the foregoing, it might appear that the answer to your question is perfectly straightforward: given the supreme court's declaration that A.C.A. § 26-80-204(18)(C) is unconstitutional, the school districts are precluded from treating excess debt service millage as a credit against the 25-mill uniform rate of tax mandated by Amendment 74. However, the analysis is complicated somewhat by the fact that the Supreme Court in Lake View stayed its mandate until January 1, 2004 in order to allow the General Assembly and the executive branch time to cure the constitutional deficiencies in the public school system.351 Ark. at 96-97. The question arises, then, whether the court's declaration that subsection (C) of the statute is unconstitutional and void is itself not effective until January 1, 2004, thereby enabling school districts in the meantime to treat excess debt service millage as a credit against the uniform rate of tax.
In my opinion, this question must be answered in the negative. In beginning its discussion of the stay, the court bluntly made a present-tense declaration that the system is unconstitutional: "Because we hold that the current school-funding system is unconstitutional, our schools are now operating under a constitutional infirmity." Id. at 96. The court then made clear that it was issuing the stay as a practical necessity in order to give officials time to remedy the deficiencies:
 Clearly, the public schools of this state cannot operate under this constitutional cloud. Were we not to stay our mandate in this case, every dollar spent on public education in Arkansas would be constitutionally suspect. That would be an untenable situation and would have the potential for throwing the entire operation of our public schools into chaos. We are strongly of the belief that the General Assembly and Department of Education should have time to correct this constitutional disability in public school funding and time to chart a new course for public education in this state. Accordingly, we stay the issuance of our mandate in this case until January 1, 2004. This will give the General Assembly an opportunity to meet in General Session and the Department of Education time to implement appropriate changes. On January 1, 2004, the stay will terminate, and this case will be over. Any subsequent challenge will constitute separate litigation.
Id. at 97. This passage in effect declares a stay not on the judgment of unconstitutionality, but rather on any claims based on the acknowledged constitutional infirmities during the period the court has allowed the state to fix the problems.[3] It is a charge to the government to make the arrangements for compliance by the recited date. As reflected in the passage just quoted, the supreme court has clearly indicated that the entire Lake View litigation will be resolved as of the deadline date. Implicit in this declaration is a command that the state undertake all actions necessary to effect this resolution prior to the deadline, running the gamut from appropriating funds to defray the plaintiffs' attorneys' fees,[4] striking legislation deemed unconstitutional and enacting whatever legislation is necessary to create an adequate and equitable system of public education.
Moreover, regardless of what action the state might take, the above passage is implicitly a charge to county officials, in the exercise of their constitutional duties as defined in Amendment 74, to compute and to levy a 25-mill property tax in accordance with constitutional principles — i.e., without granting any constitutionally impermissible credit for any such category as excess debt service millage. Subsection (b)(1) of Amendment 74 bluntly declares that "[t]here is established a uniform rate of ad valorem property tax of twenty-five mills" (emphasis added) — a pronouncement echoed verbatim at A.C.A. § 26-80-101(a). I have emphasized the verb in this language to stress that the voters, in adopting Amendment 74, themselves actually imposed the levy as a matter of constitutional law, leaving it up to county officials only to undertake such actions as are necessary to collect the amounts levied. Subsection (b)(3) of Amendment 74 and A.C.A. § 26-80-101(b) further dictate that "[t]he uniform rate of tax shall be assessed and collected in the same manner as other school property taxes" — i.e., by action of the collector following levy by the quorum court. See A.C.A. § 14-14-904(b).
I am aware of the fact that A.C.A. § 6-14-114(4)(D) (Repl 1999) currently provides for periodic voter approval of "[t]he total millage rate levied for all purposes in the school district" — a requirement that appears inconsistent with the proposition that Amendment 74 in itself levied the uniform rate of tax. I am also aware of the fact that, in accordance with this statute, the uniform rate of tax is normally submitted to the school district voters for their approval. See also Lake View, 351 Ark. at 89
(stating in dictum that "each school district is responsible for assessing [sic: `levying'] a uniform rate of 25 mills for maintenance-and-operation purposes"). However, to the extent this statute suggests that the voters could decline to levy the uniform rate of tax, I believe the statute is constitutionally suspect, since the voters have already levied the tax as a matter of constitutional law in adopting Amendment 74.[5]
In my opinion, should the quorum court fail to levy the full uniform rate of tax prior to the deadline announced in Lake View, its members would be subject to the penalties set forth in A.C.A. § 26-80-207, which provides:
 (a) All duties imposed by this subchapter and subchapter 1 of this chapter on all state and county officers are declared to be mandatory, and any officer who neglects, fails, or refuses to perform any such duty shall be subject to removal from office and liable on his official bond for such neglect, failure, or refusal.
 (b)(1) Upon the refusal or failure of any state officer to perform any duty imposed upon him under the provisions of this subchapter and subchapter 1 of this chapter, any citizen of the state may, and the Attorney General of the State of Arkansas shall, institute in the proper court mandamus proceedings to compel the state officer to perform his duties.
 (2) Upon the refusal or failure of any county officer to perform any duty imposed upon him under the provisions of this subchapter and subchapter 1 of this chapter, any citizen of the county may, and the prosecuting attorney of the district including such county shall, institute in the proper court mandamus proceedings to compel the county officer to perform his duties.
Question 2: Will those school districts that are not currently voting therequired twenty-five (25) mills for maintenance and operations (MO) berequired to submit a proposed millage increase to their patrons at theSeptember school board elections in order to reach the required millagelevel? Can this question be submitted to the patrons of a school districtat a special election?
In my opinion, Amendment 74, § (b)(1) in and of itself, without any further action by the voters, obligates the quorum court to levy a 25-mill tax at its regularly scheduled November meeting. However, as noted in my response to your previous question, A.C.A. § 6-14-114(4)(D) requires a vote by school district member on "[t]he total millage rate levied for all purposes in the school district" — a figure that necessarily includes the uniform rate of tax. Although the vote on the uniform rate of tax must consequently occur by statutory directive, whatever the election result, district voters cannot avoid the constitutionally mandated tax, which the quorum court will be obliged to levy in November. See A.C.A. § 14-14-904(b)(1) (Supp. 2001) (directing the quorum court to levy taxes at its regular meeting in November). Nevertheless the statute calls for an election. Accordingly, I believe the answer to the first of your two questions is "yes": all districts will be are required to submit the uniform rate of tax for a vote in the annual election, notwithstanding the fact that voter disapproval can have no practical effect.
With respect to your second question, the law currently authorizes special elections to address debt service, including the restructuring of debt, and to levy additional mills. A.C.A. § 6-14-102(d). Faced with the supreme court's declaration in Lake View that excess debt service millages may not be credited against the 25-mill uniform rate of tax mandated by Amendment 74, various school districts have reportedly scheduled elections to restructure their debts in order to reduce the overall rate of tax. In my opinion, such elections are clearly authorized either as regular elections in September or as special elections pursuant to A.C.A. § 6-14-102(d) (Repl. 1999), which provides:
 The board of directors of any school district shall have the authority to request the county board of election commissioners to call a special election for the purpose of considering a rate of tax for additional millages for maintenance and operations or for debt service as authorized by Arkansas Constitution, Amendment 74, provided that:
 (1) All constitutional and statutory requirements for a special school election are met; and
(2) The date of the election is approved by the director.
(Emphasis added.)[6]
Even though a vote on the sole question of levying the uniform rate of tax might be described as involving the levying of "additional millages for maintenance and operations" as commonly understood, I do not believe this language as used in A.C.A. § 6-14-102(d) is intended to apply to the levy of a constitutionally mandated 25-mill uniform rate of tax. Rather, I believe this statute is clearly intended to authorize special elections only to restructure debt or to levy millages over and above the uniform rate of tax — a process expressly contemplated in subsection (c)(1) of Amendment 74, which provides in pertinent part:
 In addition to the uniform rate of tax provided in subsection (b), school districts are authorized to levy, by a vote of the qualified electors respectively thereof, an annual ad valorem property tax on the assessed value of taxable real, personal, and utility property for the maintenance and operation of schools and the retirement of indebtedness. . . . The Board of Directors shall submit the tax at the annual school election or at such other time as may be provided by law.
(Emphasis added.)
Question 3: What are the consequences for the failure of a schooldistrict to submit a millage increase for consideration by their patronsat either a special election or the September school board election? Whatare the consequences to the school district if the patrons of the schooldistrict fail to approve such a millage request?
As previously noted, A.C.A. § 6-14-114(4)(D) currently dictates that school district electors vote at the annual September election upon the 25-mill uniform rate of tax mandated by Amendment 74, § (b)(1). As further noted, I do not believe officials are authorized to submit this issue at a special election, at least not if the election does not also raise issues of debt restructuring or the levying of additional millages. Notwithstanding the current requirement that electors vote on the uniform rate of tax, I do not believe either a failure to hold the election or the voters' rejection of the tax would have any practical consequences. Amendment 74 declares as a matter of constitutional law that the tax is "established" and mandatory. Regardless, then, of whether the voters have approved or even considered the tax, the quorum court will have no choice but to levy it.
Question 4: Can the General Assembly pass legislation that would extendthe time frame for school districts to submit proposed millage increasesto their patrons for consideration to meet the requirements of theArkansas Supreme Court's Lake View opinion? If not, why not?
I am unable to answer this question, which I believe reflects an erroneous assumption. As suggested in my preceding responses, notwithstanding the statutory requirement of an election on the issue, I believe it is mistaken to suggest that the timing — or, for that matter, even the conduct — of a millage election bears in any way on compliance with the court's directives in Lake View. In my opinion, at issue is only whether the quorum court levies a 25-mill tax using a constitutionally permissible formula prior to the January 1, 2004 deadline. If it does not, it will have failed to meet the Lake View requirements in derogation of Amendment 74. Pursuant to A.C.A. § 14-14-904(b)(1) (Supp. 2001), this levy should occur in November unless the county judge and county clerk obtain an extension to levy taxes of up to 60 days "for good cause shown resulting from reappraisal or rollback of taxes." It would appear, then, that the primary available avenue for tax relief in the wake of LakeView is debt restructuring of the sort that various districts are currently prepared to submit to the electors.
Assistant Attorney General Jack Druff prepared the foregoing, which I hereby approve.
Sincerely,
MIKE BEEBE Attorney General
MB:JD/cyh
[1] Subsection 26-80-204(6) of the Code defines the term "debt service millage" as follows:
 "Debt service millage" means the total number of mills voted by the electors of a school district to be pledged as security for the retirement of bonded indebtedness.
Subsection (9) of this statute defines the term "excess debt service millage" as follows:
 "Excess debt service millage" means the difference between the debt service millage levied and the debt service millage required. This amount shall be presumed to be available for maintenance and operation but may be used for other school purposes, provided that the district is in compliance with the uniform rate of tax.
Subsection (7) defines the term "debt service millage required" as follows:
 "Debt service millage required" means the calculated millage rate equal to the amount of millage pledged to mandatory callable bonds plus the result of the scheduled calendar year bonded debt payment divided by the total assessed value of real, personal, and utility property in the local school district.
[2] Subsection 26-80-204(5) defines the term "debt service funding supplements" in pertinent part as follows:
 "Debt service funding supplements" means the state financial aid provided to qualifying local school districts for the purpose of reducing existing debt service burdens and increasing the amount of local revenue available for maintenance and operation expenditures. . . .
In Ark. Op. Att'y Gen. No. 2003-014, I opined that A.C.A. § 26-80-204(18)(D), like subsection (C), is constitutionally suspect.
[3] For a trenchant criticism of the court's practice of staying its mandate to allow time for remediation, see Justice Glaze's dissenting opinions in Lake View, supra, and in Lake View School District No. 25 v.Huckabee, 340 Ark. 481, 10 S.W.3d 892 (2000).
[4] Although the state has quite properly objected in the trial court to any entry of judgment on attorneys' fees and costs prior to the time the mandate issues, given that the supreme court retains jurisdiction until then, there could be no meritorious objection to the legislature's now appropriating an amount sufficient to pay costs and fees once the mandate issues. Indeed, any such action would constitute appropriate anticipatory compliance on a par with the quorum courts' levying the uniform rate of tax in November.
[5] My inquiries reveal that immediately after the adoption of Amendment 74, the quorum courts in seven Arkansas counties — Carroll, Craighead, Hempstead, Madison, Scott, Searcy and Independence — levied the uniform rate of tax without even submitting the matter to school district voters. In my opinion, such actions by the quorum courts are fully consistent with the mandate set forth in Amendment 74.
[6] Subsection 6-14-102(b) of the Code (Repl. 1999) further authorizes a special election under the following circumstances:
 The board of directors of any school district shall have the authority to hold the annual school election on a date other than that fixed by law provided that:
 (1)(A) The proposed budget of expenditures for the previous year, as published, incorrectly stated a proposed expenditure or rate of tax levy, as set forth in a certificate or certificates signed by each member of the board of directors, or was not published within the time required by law;
 (B) The district has suffered damage to its physical facilities in an amount exceeding one hundred twenty-five thousand dollars ($125,000) as a result of fire or other natural disaster and the board of directors has determined that the proceeds of insurance on those facilities will be insufficient to restore or replace the facilities; or
 (C) The district will lose state aid because of a court decision or legislation enacted by the General Assembly, and the board of directors takes action to change the date of the annual school election to consider a millage increase no less than sixty (60) days after the court's decision or the effective date of the legislation;
 (2) All constitutional and statutory requirements for the annual school election are met; and
 (3) The date of the election is approved by the Director of the Department of Education.
None of these conditions applies under the circumstances you have described.
Section 6-14-105 of the Code, which predates A.C.A. § 6-14-102, further generally authorizes a county court to schedule a special school district election upon the request of the district board of directors. However, with respect to millage elections, I believe this statute is superseded by A.C.A. § 6-14-102, which authorizes special millage elections only to levy mills in addition to the uniform rate of tax imposed by Amendment 74. As the court stated in Gazaway v. Greene County Equalization Bd.,314 Ark. 569, 575, 864 S.W.2d 233 (1993):
 The phrase expressio unius est exclusio alterius is a fundamental principle of statutory construction that the express designation of one thing may properly be construed to mean the exclusion of another. Chem-Ash, Inc. v. Arkansas Power Light Co., 296 Ark. 83, 751 S.W.2d 353 (1988); Venhaus v. Hale, 281 Ark. 390, 663 S.W.2d 930
(1946).